## No. 16,431.

### GEORGE v. DOWER ET AL.
(240 P. [2d] 897)

Decided December 17, 1951. Rehearing denied February 11, 1952.

Messrs. HODGES, VIDAL & GOREE, Mr. ROBERT H. DARDEN, Mr. RALPH SARGENT, JR., for plaintiff in error.

Messrs. LEWIS, GRANT, NEWTON, DAVIS & HENRY, Mr. BYRON R. WHITE, Mr. DONALD S. STUBBS, for the Colorado Milling and Elevator Company. Mr. HENRY McALLISTER, Mr. JOHN L. J. HART, Mr. J. G. HOLLAND, Mr. PATRICK M. WESTFELDT, for other defendants in error.

*En Banc.*

MR. JUSTICE STONE delivered the opinion of the court.

PLAINTIFF George in his complaint alleges in substance that about January 1938 John L. Dower represented that he and other members of the Mullen family owned 75% of the stock of the Colorado Milling and Elevator Company; that he had authority to represent the other owners; that they desired competent men to manage the company and would sell all or part of their holdings or its assets and retain part ownership, and that he requested plaintiff to aid him in securing such management personnel and in finding a purchaser for such property; that plaintiff undertook to aid Dower continuously until Dower and his associates disposed of their stock; that on February 7, 1939, plaintiff and Dower agreed that the entire capital stock of 80,772 shares could be sold at $165 per share; that prior to

March 6, 1939, plaintiff through his agents, presented to Markham, a partner of Paul H. Davis & Co., of Chicago, a proposal to undertake the furnishing of funds for such a purchase and the procurement of such management; that Markham met plaintiff and Dower in Denver, and was offered the entire stock for $14,000,000, subject to certain adjustments; that plaintiff and Dower continued negotiations with Davis & Co. until May 22, 1943, knowing that they were proposing to associate other persons with themselves in financing the purchase of the milling company; that various proposals for sale were made in which plaintiff assisted, and that Markham proposed to various people, including Thomas, Lake, Belan and Erickson, that they become associated with the company and assume its management, and that on May 22, 1943, Markham and associates purchased from 119 stockholders of the milling company 75,520 shares at $173.47 per share, except for 3,944 shares which were purchased at $171.50 per share.

That as part of the transaction, Thomas became stockholder and president of the company; Lake and Belan stockholders and vice-presidents; Markham, stockholder and director, and Erickson a substantial stockholder; that all of them, except Markham, have long been experienced operators in the milling business and were satisfactory to Dower and his associates.

That the purchase price was paid by deposit with the defendant Trust Company as escrow agent pursuant to agreement which provided that said agent should withhold the sum of $15 per share for payment of expenses and indemnification of the purchasers against error as to assets or liabilities, and that said contingent fund is sufficient to pay plaintiff's claim, and is held by the Trust Company as trustee for the use and benefit of plaintiff and for payment of his claim.

That said sale was the culmination of negotiations with Markham initiated by plaintiff, and was made pursuant to a written agreement between Union Securities

48

Corporation, a Maryland corporation acting as an associate of Markham and other associates unknown to plaintiff, of the one part, and Dower of the other part; that the administrators of Dower's estate are primarily liable to plaintiff in the sum of $672,830.76; the selling stockholders for $8.33 per share, and the milling company for $672,830.76; that the services rendered by George are of that fair and reasonable value, and that the services rendered the milling company in connection with securing new management and refinancing and readjustment of its financial structure are of like value.

The several defendants answered through thirteen separate answers, admitting sale of the stock, denying all other essential allegations, and some or all of them setting up affirmative defenses, including that of the invalidity of any agreement by the milling company to pay commission upon sale of its stock owned by individual stockholders; lack of authority of Dower to bind the company to pay such commission; bar of right of action in this court by reason of the fact that plaintiff had elected to prosecute his claim by filing it in the county court against the estate of John L. Dower, who had died prior to the commencement of the action; estoppel, and challenge to the jurisdiction on the basis of alleged failure of personal service within the state of Colorado.

After trial to the court extending over a period of thirty-one days, the court carefully summarized the pleadings, evidence and arguments, and, without considering the numerous affirmative defenses, made finding that plaintiff George was not the primary, efficient and procuring cause of the sale of the stock of the Colorado Milling and Elevator Company and was not entitled to a commission for having brought about the sale or contributing to its consummation, and that plaintiff was not employed to procure new officers to manage the company separate and apart from his engagement to procure a buyer for the stock.

Counsel for George assert that the finding that plaintiff was not the procuring cause of the sale was not a finding of fact but a legal conclusion. If so, it was predicated upon further and sufficient finding that it had not been proven by the evidence before the court that the arrangement made with Paul H. Davis & Co. and the other investment houses had anything to do with the purchase by Union Securities Corporation of the stock of the Colorado Milling and Elevator Company; nor that said purchase was contingent in any way upon the purchase by said brokers and dealers of the new stock and securities issued in connection with said sale; nor that Paul H. Davis & Co., or any other persons or corporations, were obligated or committed to advance any sum of money or be liable to contribute to Union Securities Corporation any part of the purchase price of said stock, or to participate in the purchase of said securities, but that Union Securities Corporation, solely and alone, and not in conjunction with others, either apparent or implied, or concealed, bought and paid for the stock.

The finding that plaintiff was not employed to procure new officers separate from his engagement to procure a buyer for the stock was predicated upon further finding to the effect that the officers who were employed to take over the management were not so employed until after the sale was concluded, and that arrangements, terms and conditions of their employment were made with King, of Union Securities Corporation, with which Paul H. Davis & Co. had nothing to do.

After its review of the salient facts and findings, the court said: "In view of the conclusions the court has arrived at, supra, it becomes unnecessary for the court to pass upon many other interesting legal questions posed during the trial. The issues joined are found in favor of the defendants and against the plaintiff, and judgment of dismissal of the complaint is entered." Unless there was error in connection with the determination of the issues so specifically found, there is no ques-

tion now before us, but that of determining whether there was any competent evidence to support those findings. If there was, we must affirm.

█ Plaintiff in error contends that the trial court erred in adjudging that plaintiff's present action against the administrators of Dower's estate and other defendants was barred by reason of his having filed claim therefor against the administrators of said estate in the county court. The contention that the court so ruled on that issue is based upon the tender of that defense as an issue in answer and the finding of the trial court that, "the issues joined are found in favor of the defendants and against the plaintiff." Ordinarily such a general finding might well be construed to be a finding against the plaintiff on every issue submitted. But where, as here, the court made a specific finding on two issues determinative of the case, and recited that in view of its findings on those issues is became unnecessary to pass on the other issues posed, it patently was not the intent of the court to determine, and it did not determine, any issues except those specifically adjudicated. Patently the court would not have spent weeks of time in hearing and determining the merits of the cause if it held that plaintiff was barred from maintaining it.

█ Error further is assigned to the action of the court in striking part of a sentence in the testimony of witness Joy reciting what King had "claimed right along" regarding the reasons for the purchase in the name of Union Securities Corporation. The statement stricken was as follows: "But King had claimed right along that was really for tax saving, that that was being used to bridge over the tax gully, that the other partners were in it and therefore they could compensate us only to the extent Union had its piece." The testimony stricken was not even hearsay, but a mere conclusion of the witness based on undisclosed statements or conduct, and was properly stricken.

█ Again, error is assigned to the exclusion of testi-

mony of witness McElroy concerning a conversation with Markham, wherein the latter, on the 12th or 15th of January, 1943, told witness in effect that he believed that Davis & Co. had enough money to take over the deal and could almost assure him that it would be completed by May 31; that they had been working on some tax angles they were not entirely clear on, but believed they would get it over if Dower did not run out on them. There is no evidence nor contention that Davis & Co. had available money for cash purchase. The only purpose of such testimony, even if not hearsay and denied by Markham, was to show that the latter was then attempting to purchase the property. It is not disputed that Markham was at that time attempting to purchase, and was working on the tax angles. It was after the date of this alleged statement that Markham had his final conference with Dower when his last tentative proposal was rejected, and he withdrew. Accordingly, if the court erred in striking such testimony, the error was not prejudicial.

The other asserted errors have to do with the findings of the trial court that plaintiff was not the procuring cause of the sale. It would be futile to review in detail the 5000 folios of testimony, the many depositions and more than 600 exhibits in the record. A summary must suffice.

Plaintiff prays for compensation on the basis of reasonable value of his services. No promise to pay any commission is alleged in the complaint or shown in the evidence other than statement in a letter by Dower that plaintiff had approached them with a proposition to buy the stock at a net price of $165 per share, the buyer to assume all expense connected with the transaction, and, on another proposal, that they might trade with, "the commission to Mr. George as broker not to exceed $50,-000 and who would pay it would be agreed upon between buyer and seller"; also the testimony of Kelly, the milling company treasurer, that two or three years

before the sale was made, Dower said to George, in connection with the proposed sale to Davis & Co., that if the sale was made he would see that George was paid a commission of $50,000; that George said that was too small, but went ahead with negotiations, and plaintiff's own statement in a letter written in 1939 to a prospect named Beh, when attempting to interest him in the purchase, that "as part of the total commission to be paid to me for effecting this sale, the Colorado Milling and Elevator Company agrees to pay the sum of $50,000 as its share of the expense and places no limitation as to any additional compensation paid by the buyer to me." While predicated on the theory of reasonable value at five per cent, the amount prayed for in the complaint is the amount received in excess of $165 per share by Dower and his associates.

Plaintiff testified that on a visit to Dower on January 15, 1938, in connection with his employment in selling grain, Dower asked him to find a buyer for the milling company, pointing out the excess tax problem arising from the company's very large accumulated surplus, and its management problem, due to the ages of its operating staff, but apparently making no provision as to compensation for his services. Plaintiff thereupon interested L. G. Carlton, of Colorado Springs, but the latter's death the next September ended his investigations. Then apparently he made an arrangement with the Denver firm of ver Hulst and Co., to be associated with him, and ver Hulst presented a prospect named Rosenbaum from New York. Dower authorized an option to sell to Rosenbaum at $165 per share, payment to be made in ten days. It was learned later that Rosenbaum had no substantial financial backing and thereafter ver Hulst advised plaintiff of having made contact with Markham, a member of the partnership of Paul H. Davis & Co., investment bankers of Chicago. Markham came to Denver early in 1939, made some investigations and discussed the matter of purchase with Dower. Thereafter there was correspond-

ence between Dower and Markham and information forwarded both directly and through plaintiff regarding the company and its earnings. Dower asked approximately $14,000,000. Davis & Co. said that the earnings would not justify public offering of the stock at that price and sought to get Dower's price down. In late 1939 and early 1940 plaintiff attempted to find other interested buyers, and in December 1939 wrote to Markham urging him, if longer interested in the company, to reopen negotiations. Thereafter there was correspondence, sometimes directly between Dower and Markham and sometimes through plaintiff, but no approach to agreement between them appears.

After the latter part of September 1940 plaintiff was away from Denver a great part of the time, due to his wife's illness in California and business activities there, and he had virtually no direct contact with negotiations between Dower and Markham. Plaintiff testified that upon returning to Denver in September 1942, he saw Dower and was told that the deal was lined up with Markham and that the matter of the tax problem was being taken up with the Internal Revenue Department in Washington by Markham and his attorneys. After that date apparently he had no contact whatever with further negotiations or with the closing of the sale. He had no knowledge of Union Securities Corporation, did not know that it was negotiating, and he had no acquaintance with Joy or knowledge of his part in the transaction. In June 1943, after receiving some newspaper clippings reporting sale of the company to Union Securities Corporation, he made inquiry of the former milling company officials as to the sale and settlement of his commission. They replied that there was no commission due him because the sale had not been made to Davis & Co., but to Union Securities Corporation. He thereupon telephoned Markham, who said the only thing he could do was to talk to King of Union Securities Corporation, because the purchase was made by Union, and

Davis & Co. had nothing to do with it; that the proposition they made to Dower was turned down; that he was sorry they didn't get it.

The testimony of other witnesses and the correspondence from the files of the participating parties discloses without contradiction that attempts and negotiations for sale of the Colorado Milling and Elevator Company had been made over a period extending several years before plaintiff was in any way involved therein; that numerous investment houses had considered the matter and that in 1937 Erickson, an Omaha grain broker who later participated in the purchase here involved, had called the possible purchase of the Colorado Milling and Elevator Company to the attention of Paul H. Davis & Co. However, there was no contention that the ultimate sale resulted therefrom. The negotiations with Davis & Co., beginning in 1939, apparently were inspired by plaintiff and his associates who revived their interest in the purchase and who for a time participated in the negotiations.

No progress, even to the extent of a definite proposal from either side, was made in those negotiations throughout the year 1939. Early in 1940 Markham made Dower a proposal, conditioned on ability to sell the securities, to purchase by means of the formation of a new company, and the taking back by Dower and his associates of $3,000,000 of the new company's debentures. Between that time and August 1942, Markham made several trips to Denver and tendered several tentative proposals for purchase, most of them contingent upon company earnings, pending tax legislation or market conditions. None proposed any cash payment or suggested a solution of the income tax problems, and all required the old stockholders to take back securities for a large part of the purchase price. None of these was acceptable to Dower.

In August 1942, after Davis & Co. had been negotiating without results for three and a half years, an Eastern

broker named Joy, who acted as a "finder" in procuring investments acceptable to securities dealers, heard of the Colorado Milling and Elevator Company, obtained an introduction to Dower and came to Denver to investigate. There is no contention that he had any connection with George or his associates or that he learned of the business through them. After conference with Dower, Joy interested Union Securities Corporation of New York in the purchase of the milling company. When contacted by an officer of the Union Corporation, Dower advised him that the company's financial data could be obtained from Paul H. Davis & Co., of Chicago, and telephoned Markham advising him that Union was interested in negotiating for purchase and asking him to turn over to them all the papers they had. The two investment houses—Union and Davis & Co.—had been long acquainted and had participated in syndicates together. Union contacted a partner of Davis & Co., suggesting that they discuss the matter and see if they could work jointly. On October 27, 1942, Markham took the milling company papers with him on a trip to New York and conferred with Union's vice-president, King. Markham informed him that the price of the property was in the neighborhood of thirteen or fourteen million dollars; that Davis & Co. had not been able to offer a cash price but required retention of part of the price in securities, which was the principal stumbling block, and that there were fundamental excess profits tax difficulties which had not been solved. Thereupon King, after consulting with counsel, discussed with Markham a solution of the excess profits tax problem and suggested that a large dividend be declared after purchase of the stock, with a subsequent reappraisal to show the loss therefrom. No agreement was made between the two investment houses— Union and Davis & Co.—as to purchasing jointly. King advised Davis & Co. as to tax solution for aid in its attempt to conclude a purchase of the milling company, with the expectation that if it was successful, Union

would be invited to participate in the syndicate which would be formed to handle the securities. It was understood that any participation would be on such basis as Davis & Co. and its associates, Hornblower & Weeks, and Merrill, Lynch & Co. might determine. In the event of the failure of Davis & Co., King expected to attempt the purchase of the milling company for Union.

In November 1942, Markham again visited Dower in Denver and then made a preliminary written offer based upon his conference, whereby Davis & Co. would purchase all the outstanding shares of capital stock at a price of $1,500,000 for the fixed assets, plus additions since May 31, 1940, and less depreciation, plus the value of current assets at time of purchase. Payment was to be made by means of a seven million dollar dividend after purchase and the issuance of four per cent secured debentures to be taken by the old stockholders. This offer was contingent upon the balance sheet of the company at the time of consummation reflecting a condition satisfactory to the purchasers. Markham stated that if this proposal were acceptable, they should enter into a formal agreement and he would take steps looking toward the procurement of operating personnel who would be satisfactory to Dower. This offer was made without discussion with or advice to King regarding it. Dower made no reply to the proposal but busily pursued negotiations with other parties who seemed then interested in purchase of the company. Early in 1943, King asked Markham if they had made a deal with Dower and, learning that none had been made, told Markham that he was going to attempt purchase for Union.

By agreement, Markham and King went to Denver together on January 25, 1943, with appointment to meet Dower, taking with them Erickson, a friend of Dower, who had long been trying to promote a sale of the milling company. At the conference it appeared that Markham had no proposal other than the one he had made in November, and Dower would not consider it. There-

upon King made an offer in behalf of Union Securities Corporation of $50,000 for an option to purchase on terms similar to the Markham proposal, except that full payment of the purchase price of approximately $14,-000,000 was to be made in cash, with the privilege to Dower of buying any securities or none. The $50,000 was to be forfeited if the balance of the purchase price should not be paid upon completion of the audit necessary to determine the exact price. His proposal was accepted. Thereafter formal agreement was signed, the $50,000 payment made, and upon conclusion of the audit Union Securities Corporation paid in cash the full balance of the purchase price in the amount of $13,050,-454.40. Thereupon the articles of incorporation of the milling company were amended, the capital structure remodeled, and new issue of debentures and common stock provided for as deemed advisable by Union Securities Corporation. Then 297,990 shares of the new common stock of $1 par value were issued to Union, of which 108,890 shares were retained by it, including 10,-000 shares which were sold to its vice-president, King; 77,100 shares were sold to Davis & Co., and the balance to other participating banking houses and individuals, all at two dollars per share. Of the $6,500,000 of debentures issued, Union retained $2,984,000; sold to Davis & Co. $2,130,000; to Hornblower & Weeks, $710,000, and the balance to other houses participating. Some months thereafter, the milling company took up the five per cent debentures through the sale of $3,000,000 of four per cent debentures to insurance companies, and of 70,000 shares of preferred stock through some twenty-five underwriters selected by King, including both Union Securities Corporation and Davis & Co. The registration statement by the milling company to the SEC on August 6, 1943, recited sale to the Union Securities Corporation, and subsequent sale of part of its holdings to other firms including Davis & Co.

Upon the execution of the contract between the mill-

ing company and Union Securities Corporation, the latter company, with the assistance of the old management of the milling company and Davis & Co., began active efforts to procure new and capable management to take the places of the former operators of the company who were past retirement age and eager to be relieved. Upon the purchase of the milling company stock, Union became its controlling stockholder, retained its voting power, and voted the stock throughout the year 1943. Immediately upon completion of payment therefor, Union had the milling company change its insurance coverage and placed the same in the hands of another broker. It further required the company to hedge its inventory positions, employed an architect to consider conversion of one of its buildings to different use, and instructed as to sale of certain machinery, all without consultation with Davis & Co.

In November 1942, while Markham was still attempting to purchase, Union had written Joy and his associate, agreeing to pay them for having brought the milling company to their attention. The agreement recited that in the initial instance Union might acquire all the outstanding stock of the company and that they proposed to be associated with others, particularly Davis & Co., and did not know what their exact interest would be, but would endeavor to secure as large a position as possible, and that they would pay to Joy $7,500 predicated on their having an interest of twenty per cent of the common stock of the recapitalized company; if such interest should be larger or less than twenty per cent the payment should be increased or decreased proportionately. Under that agreement Union paid to Joy the sum of $13,125. Thereafter, Joy learned that Union had been the sole purchaser and demanded increased compensation, with the result that he received from Union the further sum of $10,000 in full settlement.

The record contains positive testimony as well as written exhibits to establish that Union alone executed and

consummated the purchase of the milling company; that it procured and paid the full purchase price; that there was issued to it all the issued capital stock of the milling company except for the few shares not included in the sale; that it dictated that company's business decisions; that it determined the method of refinancing to be attempted and determined the number of shares of stock and of debentures which were offered to Davis & Co. and the other underwriting participants and the price at which they were offered, and that Davis & Co. had no prior agreement with Union as to the amount of debentures or of stock to be offered to them, or had any obligation to accept them when offered. Therefore we are bound by the findings of the trial court. The active assistance by Davis & Co. in procuring competent operating personnel to manage the reorganized milling company was explained as being given for the reason that they had closer contact with the persons desired, and that by virtue of such assistance they hoped to be invited to participate to a larger extent in the underwriting of the securities to be issued.

There is no evidence whatever in the record to indicate that plaintiff or his associates procured or sought to procure new management in behalf of Dower and his associated stockholders. The management sought and obtained was for the purpose of operating the company after the sale and that was a matter with which Dower and his associates were not concerned, since under the sale as finally consummated they took back no securities. Their only interest therein was as an inducement to a more advantageous sale, and the finding of the court that plaintiff was not employed to procure new officers to manage the company, separate and apart from his engagement to procure a buyer for the stock, is amply supported by the evidence. The evidence also, we think, overwhelmingly supports the conclusion of the trial court, that plaintiff's prospective purchaser, Davis & Co., failed in its efforts to purchase, and that another

company not produced by plaintiff did make the purchase independent of any efforts on his part. If so, he was not entitled to a commission on the sale. *Minks v. Clark,* 70 Colo. 323, 201 Pac. 45, and *Leonard v. Roberts,* 20 Colo. 88, 36 Pac. 880, and similar cases, are urged as authority to the contrary. In each of those cases the plaintiff broker, acting through one he had interested, 'was held to be the procuring or moving cause of the sale to another purchaser. To be entitled to a commission a broker "must set in motion a chain of events, which, without break in their continuity, cause the buyer and seller to come to terms as the proximate result of his peculiar activities." *Lichtig & Rothwell v. Holubar,* 78 Cal. App. 511, 248 Pac. 735. "The question is, Was the transaction which the broker was authorized to negotiate substantially consummated as the direct result of his efforts?" *Houston v. H. G. Wolff & Son Investment Co.,* 94 Colo. 73, 28 P. (2d) 255. In the instant case, if the evidence had shown that Davis & Co. had contacted Union Securities and had induced it to purchase, we would be faced with a different situation. To the contrary, the evidence here supports the court's finding that the buyer and seller came to terms, not as the result of George's activities, but independent either of George or his prospect, and was not the result of his efforts. Without denying that there is evidence in the testimony of the parties involved in the transaction to support the finding of the trial court that Union Securities Corporation was the sole purchaser, counsel for George insist that many of their statements "were obviously intended to obscure the evidence as to the true relationships between Markham and King"; that there was a conspiracy to eliminate George, and that in fact there is no doubt that their activities at all times were joint and that the purchase was a joint purchase. Even if we should assume the function of the trial court and determine that the testimony of these several business men as to the purchase was false, and that the purchase was in substance and

fact a joint purchase by Union and Davis & Co., still plaintiff's right to recovery would not be assured. The burden is upon him to establish by the preponderance of the evidence, not only that the purchase was joint, but that he was the procuring cause thereof. True, plaintiff procured Davis & Co., but Joy procured Union, and plaintiff had the burden of proof that Davis & Co. rather than Union was the inducing party to the joint purchase. Had Davis & Co. by their efforts induced Union to join in a purchase which it consummated, then the chain of causation might have been unbroken, but such was not the case. It was not Davis & Co., but Union, which first proposed the joint purchase; it was Union which called Davis & Co. with request to see the milling company records in their possession; it was Union which devised the solution of the income tax difficulties; it was Union which offered Dower an acceptable contract after Davis & Co. had failed; it was Union which risked the $50,000 cash option; it was Union which procured and paid over the purchase price in cash—too large for Davis & Co. to handle; it was Union which determined the amount and price of the shares and debentures subsequently sold to Davis & Co. In such situation, even if it be considered a joint purchase, plaintiff has failed to show that the trial court erred in finding that he was not the procuring cause of the sale. See, Anno. 164 A.L.R. 949, et seq.

In *Hodgin v. Palmer*, 72 Colo. 331, 211 Pac. 373, the sale was ultimately made to the prospect originally interested in the property and placed in contact with the owner by plaintiff. However, no agreement was then reached with the owner as to price and terms and plaintiff's activities ended. Later, through another agent, his former prospect made a slightly different offer which was accepted by the owner and we held that we could not disturb the trial court's findings that the second broker, rather than plaintiff, was the procuring cause of the sale. So here—even if we consider the purchase to have been made by plaintiff's prospect jointly with

Joy's prospect—Joy, rather than plaintiff, set in motion the chain of events which resulted in the sale. See, *Hollyday v. Southern Farm Agency,* 100 Md. 294, 59 Atl. 646.

A situation strikingly similar to the one before us appears in *Holton v. Shepard,* 291 Mass. 513, 197 N.E. 460. In that case, Shepard promised plaintiff a commission if he produced a purchaser for his stores. Plaintiff interested Seymour & Co., of New York, who with the assistance of plaintiff negotiated with defendant toward their purchase at a price of about $5,000,000. Shepard desired cash and declined to accept stock in a purchasing corporation. Without any break in those negotiations, defendant began negotiating with Sawyer Brothers of Boston, who had become interested through another broker. Sawyer Brothers had close business relations with Seymour & Co. through mutual buying and selling of securities. In February 1928, Sawyer Brothers entered into written contract of purchase of the stores at a price of approximately $4,800,000, with cash deposit of $100,000. In May 1928, prior to final payment thereunder, Seymour & Co. entered into an agreement with Sawyer Brothers, whereby they shared in underwriting the stock of the holding company which took over the Shepard stores. Sawyer Brothers and Seymour & Co. signed a joint note secured by pledge of the stock of the new holding company as security for a bank loan of $1,000,-000 required to be paid in cash to Shepard under his contract of sale. The extent of the interest of Seymour & Co. in the holding company was not shown, but they received 32,500 shares of the common stock as against 42,500 to Sawyer Brothers and 25,000 to other participants. Upon trial of plaintiff's suit for commission, a general verdict was returned in his favor, but subsequently by order of the trial judge verdict was entered for defendant under leave reserved. After discussion of the evidence and rules involved, the court said: "According to all the testimony, Sawyer was the dominant

personality in the purchase of the Shepard stores. Even if the testimony of Sawyer and the defendant be discredited, the proposition that the Seymour company was the purchaser from the defendant is not proved."

 In the instant case, we are not required to justify the setting aside of a verdict, as in the Holton case, and to hold that as a matter of law plaintiff could not recover, but to determine only, as we do, that there was substantial evidence to support the finding of the trial court against him.

 Finally, it is urged in behalf of George that even if he did not procure a sale, Dower was liable to him for the reason that he repudiated the terms as to price and payment, which he had authorized George to make in his behalf, and disclaimed his own authority for such offer. No such claim appears in the complaint; no finding thereon was made by the trial court; and the evidence discloses no basis for the contention; accordingly, it cannot be sustained.

The judgment is affirmed.

Mr. Chief Justice Jackson and Mr. Justice Knauss not participating.