MOORE AND COMPANY, a Colorado
corporation, and H.L. Richison,
Petitioners,

v.

T–A–L–L, INC., a Colorado
corporation, Respondent.

No. 88SC626.

Supreme Court of Colorado,
En Banc.

May 29, 1990.

Rothgerber, Appel, Powers, & Johnson, Richard K. Clark, Elizabeth T. Wald, Denver, for petitioner Moore and Co.

Hall & Evans, Eugene O. Daniels, Denver, for petitioner H.L. Richison.

Aisenberg & Kaplan, P.C., Bennett S. Aisenberg, Edward A. Brown, Holme, Roberts & Owen, Daniel S. Hoffman, Denver, for respondent T-A-L-L, Inc.

Chief Justice QUINN delivered the Opinion of the Court.

We granted certiorari to review the decision of the court of appeals in *T-A-L-L, Inc. v. Moore and Co.*, 765 P.2d 1039 (Colo. App.1988), which held that a real estate brokerage company which has entered into an exclusive listing agreement with the seller and breaches its fiduciary duty to the seller forfeits the total amount of the commission paid by the seller, even though the broker, under the real estate contract of sale, is required to split the commission with the buyer (another real estate broker). We agree with the court of appeals that when, as here, a real estate broker breaches a fiduciary duty to the seller, the broker is not entitled to retain any part of the commission paid by the seller. Under the principle of unjust enrichment, however, we conclude that the broker is required to forfeit only the amount of commission retained by the broker under the contract of sale and not that part of the commission paid to the buyer or other parties. We accordingly affirm the judgment in part and reverse in part, and we remand the case to the court of appeals with directions to reinstate the judgment of the trial court.

## I.

T-A-L-L, Inc. (TALL), a Colorado corporation, entered into an exclusive listing agreement with Moore and Company, Inc. (Moore & Co.), a Colorado real estate company, through one of Moore & Co.'s real estate brokers, H.L. Richison, for the sale of TALL's property, which consisted of approximately eighty acres of undeveloped land in Adams County, Colorado, for a price of $1.6 million. As a result of Richison's alleged conduct in connection with the sale of the property, TALL filed a complaint in the district court in which it sought money damages from Moore & Co. and Richison for their breach of fiduciary duty in the course of the listing and sale of the property. The case was tried to the court which ultimately found in favor of TALL. A review of the events leading up to the judgment will place the issues before us in proper context.

TALL entered into the exclusive listing agreement with Moore & Co. on February 1, 1982.[1] The agreement called for TALL to pay Moore & Co. a commission of ten percent of the purchase price of the property. H.L. Richison (Richison), a licensed real estate broker with Moore & Co., handled the listing agreement for TALL at all times during the events in question.

---

1. TALL originally entered into a listing agreement with Moore & Co. in July 1981 for a period of six months. Upon the expiration of the six-month period, TALL agreed to list the property again with Moore & Co. for an additional six months.

On February 8, 1982, Newcomb–Weidner Company (N–W), a Colorado real estate company operated by Warner Newcomb and Gail Weidner, made an offer to purchase the property for $1.4 million, contingent upon N–W's ability to obtain subscriptions for 100 percent participation in a syndicate "to be formed on or before June 15, 1982, or 120 days from acceptance of [the] contract, whichever is longer."[2] TALL rejected the N–W offer, but submitted a written "counterproposal" which modified the terms of the payment at closing and the interest rate on the balance.[3] TALL's counterproposal was accepted by N–W on March 1, 1982, and the acceptance was received by TALL four days later. The sale contract expressly provided that the ten percent commission to be paid by TALL would be divided equally between Moore & Co. and N–W, the real estate company-purchaser.

On March 5, 1982, David Fair, a real estate broker with Grubb & Ellis Company, submitted an offer to Richison on behalf of DG Shelter Products Co. (DG Shelter) to purchase the property for $1.6 million.[4] Fair requested that Richison permit him to be present when the DG Shelter offer was presented to TALL. Richison told Fair that the property was under contract with N–W, that the contract contained a syndication contingency until June, 1982, and that he expected the closing to take place. Richison and Fair mutually agreed that the DG Shelter offer would not qualify as a backup contract since DG Shelter would not know until June 1982 whether the N–W

contract was effective. Two days later, on March 7, Richison contacted Warren Newcomb, an officer of N–W, and told him that a client of Grubb & Ellis had made an offer of $1.6 million on the property, a price considerably higher than N–W's offer. During this conversation, Richison asked Newcomb whether he was interested in discussing this offer, and when Newcomb indicated that he was, Richison agreed to meet with the officers of N–W the following morning.

On March 8, 1982, Warren Newcomb and Gail Weidner met Richison at his office. As the meeting began, Richison received a telephone call from Charles Taylor, TALL's agent. Richison spoke from a telephone in a separate room, and Newcomb overheard him discuss with Taylor the offer of $1.6 million made by DG Shelter. Taylor at this time told Richison that he was not interested in the $1.6 million offer because TALL was obliged to close on the N–W contract. During the conversation Richison did not seek permission from Taylor to disclose to N–W the $1.6 million offer made by DG Shelter, nor did Richison inform Taylor that he was at that time meeting with representatives of N–W.

After this telephone conversation, Richison disclosed the terms of DG Shelter's offer to Warren Newcomb and Gail Weidner, who expressed their willingness to discuss the offer with DG Shelter. In a telephone conversation with David Fair, the real estate broker with Grubb & Ellis, Richison told Fair that TALL had rejected

---

**2.** The contingency clause provided that "[i]f 100% of the syndicate is not subscribed within this said time period, this contract may[,] at the option of the Purchaser, be terminated, becoming null and void and of no further force or effect and the earnest money deposit shall be forewith [sic] returned to the Purchaser."

**3.** The N–W offer provided for a purchase price of $1,402,467.50, of which $10,000 was tendered as earnest money, $270,493.50 was to be paid in cash or certified funds at the closing, and the balance of $1,121,974 was to be evidenced by a promissory note, secured by a first deed of trust on the property, bearing interest at the rate of ten percent per year, and providing for interest payments only during the first five years and thereafter annual payments of principal and

interest in the amount of $132,123.66 commencing in the sixth year and continuing thereafter for a period of fifteen years.

The counterproposal submitted by TALL and accepted by N–W amended N–W's original offer by requiring a payment of $350,617.50 at closing, with the balance of $1,051,850 to be evidenced by a promissory note payable semiannually at the rate of eleven percent per year, with interest payments only during the first five years and thereafter principal payments of $52,-592.50, plus interest, payable semiannually, and with the entire principal and interest due and payable ten years from the date of closing.

**4.** DG Shelter, a California corporation, is a wholly owned subsidiary of Di Giorgio Corporation, a New York corporation.

DG Shelter's offer but that N–W was willing to discuss the assignment of its contract rights to DG Shelter. Fair requested Richison to set up a meeting with N–W. On March 10, 1982, Richison, Fair, and the officers of N–W met in Richison's office to discuss the assignment of N–W's contract rights to DG Shelter. One or two days later, the officers of N–W met with Fair and a representative of DG Shelter. At this meeting, N–W agreed to assign its contract to DG Shelter for $300,000 and effectuated the assignment on March 16, 1982.[5]

On March 30, 1982, Richison met with Warren Newcomb and inquired about the assignment of the N–W contract to DG Shelter. When Newcomb informed Richison that N–W had received $300,000 for the assignment, Richison stated that he desired to renegotiate the 50–50 commission split between Moore and Co. and N–W to a 60–40 split. Warren Newcomb, however, rejected any renegotiation.

The closing occurred on May 25, 1982. At the closing TALL conveyed the property directly to DG Shelter for $1,402,467.50, pursuant to the assignment from N–W. Moore & Co. received a commission of $70,-123.37, and, pursuant to an agreement between N–W and Grubb & Ellis, N–W received a commission of approximately $50,-000 and Grubb & Ellis a commission of approximately $20,000.

After hearing testimony on the above sequence of events and expert opinion testimony from several real estate experts, the trial court found, in pertinent part: that the DG Shelter offer was very material information which was confidential and should have been disclosed to TALL; that although the prospect of TALL's buying out N–W was doubtful, a backup contract with DG Shelter was a valuable asset to TALL; and that the disclosure of the DG Shelter offer and the subsequent N–W and DG Shelter meeting ruined any chance of TALL's renegotiating the contract with N–W or of obtaining a backup contract offer from DG Shelter. The court concluded that Moore & Co., acting through Richison, breached its fiduciary duty to TALL in the following respects: disclosing to the officers of N–W on March 7, 1982, without having previously disclosed the same information to TALL, that Grubb & Ellis had submitted an offer on behalf of DG Shelter for $1.6 million—a price substantially higher than the N–W contract price; arranging a meeting with the officers of N–W concerning the DG Shelter offer without first disclosing the DG Shelter offer to TALL and without obtaining TALL's permission to attend the meeting; failing to disclose to TALL's representative, Charles Taylor, during Richison's telephone conversation with Taylor on March 8, 1982, the DG Shelter offer and the fact that Richison was meeting at that very moment with representatives of N–W concerning the DG Shelter offer; discussing the details of the DG Shelter offer with N–W during the March 8 meeting without first having obtained the permission of TALL; failing to provide TALL with advice or assistance about the possibility of buying out or renegotiating the contract with N–W or about restructuring the DG Shelter offer in a manner beneficial to TALL; meeting with Grubb & Ellis and representatives of N–W on March 10, 1982, without the knowledge or consent of TALL, regarding the assignment of the N–W contract to DG Shelter; and attempting to increase Moore & Co.'s commission split by reason of N–W's assignment of its contract to DG Shelter.

5. On March 23, 1982, Pearl Taylor and Charles Taylor, representatives of TALL, met with TALL's lawyer in the lawyer's office. Present at this meeting were a representative of DG Shelter and David Fair of Grubb & Ellis. Although Richison had been invited, neither he nor any other representative of Moore & Co. attended the meeting. The purpose of the meeting was to determine the sequence of events with respect to the N–W and DG Shelter offers. After the meeting Pearl Taylor approved the offer of DG Shelter, but TALL's lawyer advised against this action since it would circumvent TALL's contractual obligation to N–W and could possibly result in litigation. The DG Shelter offer, therefore, was not formally accepted by TALL. So far as the record shows, TALL's representatives were not aware at this time of Richison's activities in relation to the DG Shelter offer and did not learn of the full extent of his conduct until some months later.

Although the trial court did not find that TALL sustained a specific monetary loss as a result of Moore & Co.'s breach of fiduciary duty,[6] it nonetheless concluded that Moore & Co.'s forfeiture of its share of the commission would avoid any unjust enrichment to Moore & Co. and accordingly entered judgment against Moore & Co., and Richison, in the amount of $70,123.37, plus interest from the date on which the commission was paid.

TALL appealed the judgment to the court of appeals, arguing that the trial court erred in not assessing damages against Moore & Co. and Richison for the full commission of $140,246.74 paid by TALL as a result of the sale of the property. The court of appeals concluded that the record supported the trial court's findings relating to Moore & Co.'s and Richison's breach of fiduciary duty and ordered that judgment be entered in favor of TALL in the amount of $140,246.74, plus interest. *T-A-L-L*, 765 P.2d 1039. The court of appeals reasoned that "where, as here, a broker has breached his fiduciary duty, that broker is not entitled to any compensation inasmuch as it would be unjust to allow him to retain a commission when he has not acted with the utmost good faith toward his principal." 765 P.2d at 1042. In addition, the court of appeals concluded that Moore & Co., although it retained only one-half of the commission paid by the seller, nonetheless was required under the doctrine of unjust enrichment to forfeit all of the commission, because "the payment of one-half of the commission to the purchaser by broker [Moore & Co.] was of no moment to seller [TALL]," whose "only concern was paying approximately $140,000 commission for services rendered by broker in finding a purchaser *and* in fulfilling all of its fiduciary obligations." *Id.* (emphasis in original).

We granted Moore & Co.'s and Richison's petitions for certiorari to consider the following two issues: whether a real estate broker automatically forfeits a real estate commission for breach of fiduciary duty when the broker withholds material information from the seller and discloses confidential information to another purchaser; and whether the court of appeals properly applied the doctrine of unjust enrichment so as to require the broker to forfeit more than its share of the commission received for the sale of the property in question. We address these issues in turn.

## II.

Moore & Co. and Richison argue that unless the real estate broker has engaged in fraud or self-dealing, has taken a secret profit, or has committed some form of misconduct resulting in a demonstrable loss to the seller, the real estate broker should not be required to forfeit a commission simply because of a breach of fiduciary duty. We reject this argument.

◼ "[I]t is a widely accepted rule of agency law that a real estate broker operating under an exclusive listing contract with the seller of the property stands in an agency relationship to the seller." *Stortroen v. Beneficial Finance Co.*, 736 P.2d 391, 396 (Colo.1987). A real estate broker, as agent, owes a fiduciary duty to the seller, as principal. The fiduciary duty owed by the broker to the seller under an exclusive listing agreement includes the duty to act with utmost good faith and loyalty in all dealings with the seller and to use reasonable care in carrying out the agency agreement and to account to the seller for all money and property received by the broker. *See McKinney v. Christmas*, 143 Colo. 361, 353 P.2d 373 (1960); *Treat v. Schmidt*, 69 Colo. 190, 193 P. 666 (1920); *Colorado Real Estate Manual,*

---

**6.** Although the court did not find that TALL sustained a monetary loss, the court did conclude that Moore & Co.'s breach of fiduciary duty worked to TALL's potential detriment because:

first, any option, even if slight, to renegotiate or buy out Newcomb–Weidner was lost, sec-

ondly, any chance to persuade DG [Shelter] to make a backup offer was lost, and thirdly, the ability and right of TALL to decide which, who and when people were to receive confidential information about the value of their property was lost.

13–2 (1986) [7]. "Part and parcel of this duty is the requirement that [the broker] make a full and complete disclosure of all facts relative to the subject of his agency which it may be material to the principal to know." *McKinney*, 143 Colo. at 363, 353 P.2d at 374; *see also Wheeler v. Carl Rabe, Inc.*, 198 Colo. 311, 599 P.2d 902 (1979). The broker's duty, in other words, "is not only to act solely for the benefit of the principal in matters entrusted to [the broker] …, but also to take no unfair advantage of his position in the use of information or things acquired by [the broker] because of his position as agent or because of opportunities which his position affords." Restatement (Second) of Agency, § 389 at 202, comment b (1958). Where the agency agreement expressly authorizes the broker to sell the property, the broker's fiduciary obligation does not end with the execution of a contract of sale but continues up to and through the closing. *See Wheeler*, 198 Colo. 311, 599 P.2d 902.

A real estate broker acting under a valid listing agreement is entitled to receive a commission when the broker produces a purchaser who is ready, willing, and able to purchase the property upon the terms designated by the seller and when the broker is the efficient agent or procuring cause of the sale. *E.g.*, *Circle T Corp. v. Deerfield*, 166 Colo. 238, 444 P.2d 404 (1968); *Bradley Realty Investment Co. v. Shwartz*, 145 Colo. 65, 357 P.2d 638 (1960); *see also George v. Dower*, 125 Colo. 45, 240 P.2d 897 (1952). In light of the broker's fiduciary duty to the principal, however, it has long been the law in this state that the broker's concealment from the principal of information that bears upon the transaction in question will defeat the broker's claim for compensation. *Collins v. McClurg*, 1 Colo.App. 348, 29 P. 299 (1892). The fact that the principal may not sustain an actual monetary loss as a result of the broker's breach of fiduciary duty to the principal will not serve to exonerate the broker so as to validate the broker's claim for a commis-

7. The 1986 version of the *Colorado Real Estate Manual,* which was compiled under the auspices of the Colorado Real Estate Commission, provides as follows with respect to the duties owed to the principal by the agent:

The agent also owes four basic duties to his principal—(1) to perform the agency agreement, (2) to be loyal to his principal, (3) to use reasonable care in performing the agency, and (4) to account for all money and property received.

\* \* \* \* \* \*

The agent owes a duty of loyalty and trust to his principal. He may not personally profit from the agency relationship, excepting his agreed upon compensation. He has the duty not to disclose both during and after the agency relationship, confidential information obtained as a result of the agency if such disclosure would be to his principal's disadvantage or prejudice. An agent may not have interests adverse or opposed to those of his principal; nor may he represent another who has adverse or opposed interests, unless he has his principal's consent. Thus a real estate broker or salesman should not purchase property for himself from his client without the client's consent. Nor should he represent the buyer without his seller's permission. The broker should not withhold any offers to purchase because he fears that the new offer, which may be only slightly higher, might upset a current deal. The agent must use his best efforts to obtain the most advantageous deal he can for his principal.

The agent has the duty to keep his principal fully informed of material facts that may affect the subject matter of the agency. If the agent fails to inform his principal, he can be held liable for loss resulting to the principal. Thus a real estate broker should inform his seller of a zoning change or proposed change that might enhance the value of the property so that the seller may profit from the increased value.

The agent has the duty to use reasonable care in the performance of the agency. He can be held liable to the principal for any loss caused by his lack of care. An agent holding himself out to the public as possessing certain abilities and skills has the duty to use the care of a competent person having such abilities or skills. Thus a real estate broker or salesman must have and use the care and skill usually possessed by a competent real estate broker or salesman in that locality. He cannot escape responsibility for his negligence or lack of ability by pleading ignorance.

The agent has the duty to make an accounting to his principal for all money or other valuable consideration which he receives in the course of the agency. He should keep accurate records and accounts of all transactions. He must keep the funds and property of his principal separate from his own. Thus a real estate broker should deposit in a separate trust account funds received from the buyer as part payment on the purchase of real estate.

sion.[8] On the contrary, "[a]n agent is entitled to no compensation for conduct ... which is a breach of his duty of loyalty." Restatement (Second) of Agency, § 469 at 399. Comment a to section 469 of the Restatement (Second) of Agency expounds on this principle as follows:

An agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in antagonism to or in competition with the principal in a transaction is not entitled to compensation which otherwise would be due him because of the transaction. This is true even though the conduct of the agent does not harm the principal, and even though the agent believes that his conduct is for the benefit of the principal and that he is justified in so acting.

See generally Jet Courier Service, Inc. v. Mulei, 771 P.2d 486, 494–98 (Colo.1989) (recognizing that employee's solicitation of co-employees to engage in new enterprise in competition with employer constitutes breach of duty of loyalty to employer even though employee's conduct does not harm principal). We hold, therefore, that a real estate broker's breach of fiduciary duty to a seller results in a forfeiture of the broker's right to a commission regardless of whether the seller has suffered any demonstrable harm as a result of the breach and even though the breach of fiduciary duty does not amount to fraud or self-dealing or result in a secret profit to the broker. To hold otherwise would reward the broker for conduct violative of the broker's basic duty to the seller.

In the instant case, the trial court determined that Moore & Co., acting through Richison, violated its fiduciary duty to TALL in several respects, including the following: disclosing to the officers of N–W, without the permission or consent of TALL, the fact that DG Shelter had submitted an offer on the property in excess of the contract price; meeting with the officers of N–W to discuss the details of the higher offer without having obtained the permission of TALL to do so; failing to offer advice or assistance to TALL about the possibility of buying out or renegotiating the contract with N–W or about restructuring the DG Shelter offer in a manner beneficial to TALL in the event of the failure of the syndication contingency in the N–W contract; and seeking an increased commission as a result of the assignment of the N–W contract to DG Shelter without the permission of TALL. The court of appeals concluded that there was sufficient evidence to support the finding of breach of fiduciary duty, and we agree with that assessment of the record. In light of the broker's breach of fiduciary duty, it follows that the broker is not entitled to any commission.

### III.

Since Moore & Co. and Richison breached their fiduciary duty to TALL and thereby forfeited any right to a commission, the remaining question relates to whether Moore & Co. is required to forfeit the entire commission or only the part retained by it in connection with the sale. The court of appeals reversed the trial court's award of $70,123.37 to TALL and held that, under the equitable doctrine of unjust enrichment, TALL was entitled to a judgment in the amount of the full commission of $140,246.74, plus interest from the date of judgment. Moore & Co. and Richison contend that Moore & Co. should be required to forfeit no more than that part of the commission which it actually received under the contract of sale. We agree with this contention.

In order to recover under the doctrine of unjust enrichment, a plaintiff must demonstrate: "(1) that a benefit was conferred upon an adverse party; (2) that the benefit was appreciated by the adverse party; and (3) that the benefit was accepted by the adverse party under such circumstances that it would be inequitable for it to be

---

**8.** If, of course, a real estate broker's breach of fiduciary duty causes actual loss to the seller, the broker not only forfeits the commission but also is liable for the full amount of the loss.

*Elijah v. Fender,* 674 P.2d 946, 950 (Colo.1984); *White v. Brock,* 41 Colo.App. 156, 159, 584 P.2d 1224, 1227 (1978).

retained without payment of its value." *Martinez v. Continental Enterprises*, 730 P.2d 308, 317 (Colo.1986).

> Application of the doctrine [of unjust enrichment] does not depend upon the existence of a contract, express or implied in fact, but on the need to avoid unjust enrichment of the defendant notwithstanding the absence of an actual agreement to pay for the benefit conferred.... The scope of this remedy is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another.

*Cablevision of Breckenridge, Inc. v. Tannhauser Condominium Assoc.*, 649 P.2d 1093, 1097 (Colo.1982) (citations omitted). Where, as here, a real estate broker has breached his fiduciary duty to act with utmost good faith and loyalty to the seller in dealing with the sale of real estate exclusively listed with the broker, the seller "is entitled to recover the benefit received, its value, or anything the broker received as a result." W. Edward Sell, *Sell on Agency*, § 142 at 128 (1975); *see also* Restatement (Second) of Agency, § 407(1) at 254 (1958) (if agent receives benefit as a result of violating duty of loyalty, principal is entitled to recover what agent has received, its value, or its proceeds, and also amount of any damage thereby caused).

In this case, Moore & Co.'s exclusive listing agreement with TALL expressly provided that Moore & Co. would receive ten percent of the selling price as a commission. The real estate sales contract between TALL and N–W stated that the ten percent commission would be divided equally between Moore & Co. and N–W. This provision in the N–W contract for the division of the commission between Moore & Co. and N–W served as an inducement for N–W's purchase of the property. The evidence at trial supports the conclusion that TALL did not sustain a monetary loss as a result of Moore & Co.'s breach of fiduciary duty and that Moore & Co. received no more than one-half of the commission.

By requiring Moore & Co. to forfeit the entire commission of $140,246.74, the court of appeals erroneously imposed on Moore & Co. the obligation to forfeit twice the amount of commission which it had actually received as a result of the sale to DG Shelter. Application of the doctrine of unjust enrichment to the facts of this case requires Moore & Co. to forfeit, as a result of a breach of fiduciary duty, its share of the commission—that is, $70,123.37—and not that part of the commission received by N–W and Grubb & Ellis. It is the $70,-123.37, rather than the total amount of the commission, by which Moore & Co. was unjustly enriched in this matter.

We affirm that part of the judgment holding that Moore & Co.'s breach of fiduciary duty to TALL resulted in the forfeiture of the commission actually received by Moore & Co. pursuant to the contract of sale between TALL and N–W. We, however, reverse that part of the judgment requiring Moore & Co. to pay to TALL that part of the commission which was split between N–W and Grubb & Ellis, and we remand the case to the court of appeals with directions to reinstate the judgment entered by the district court.