YERKIE *v.* SALISBURY ET UX.

[No. 235, September Term, 1971.]

*Decided February 22, 1972.*

The cause was submitted on briefs to HAMMOND, C. J., and MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

Submitted by *Victor L. Edwards* for appellant.

Submitted by *Wilmer D. Pyles* for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

In 1959 Homer and Dorothy Salisbury became the owners of a house and 15,524 square feet of land (the property) on the north side of Allentown Road about 220 yards from the main entrance to Andrews Air Force

Base (Andrews). It was their first real estate transaction. She is employed at Andrews as a clerk typist; he, because of heart disease, has been retired from the government service. They have four children, two teenagers at home, two married and living away from home.

In May 1966 Fred Ziesing visited the Salisburys. He was, at the time, a salesman for a broker named Webster. He told them he had been trying to sell an abutting property and that he thought its marketability would be improved if he could include their property. He persuaded them to sign a paper appointing Webster their "sole and exclusive broker for the purpose of selling the property * * * at the price and terms, within the time limit specified * * *." The price listed was $2.25 per square foot. The terms were all cash, "[p]roperty to be sold subject to zoning." The contract was to expire "when sold." Ziesing later added the words "or 1 yr. from date" to his copy without the knowledge or consent of the Salisburys. The printed provision for a 6% commission was amended by inserting "10%." The paper was dated 17 May 1966.

On the very next day Ziesing presented to the Salisburys a document, dated 18 May 1966, which he had prepared and which we shall describe in some detail. A combination of printing and typewriting, it recited the receipt from the appellant (Yerkie), a confessed land speculator, of the sum of $300 as a "part payment of the purchase of" the property at a total price of $24,062.20 ($1.55 per square foot), Yerkie's agreement to pay $7,000 in cash "at the date of conveyance," and his readiness to assume an existing trust of $11,000; the balance was to be secured by a second trust to be paid in three annual installments. There were inserted the typewritten words, "Property purchased subject to being [re]zoned C-2, also at purchaser's expense." Settlement was to be "[w]ithin 100 days after final zoning approval." Ziesing had signed it as "Agent." Below Ziesing's signature are the words, "We, the undersigned, hereby ratify, accept and agree to the above memorandum of sale and acknowl-

edge it to be our contract." Next appears the date "4/18, 1966" and Yerkie's signature.

The Salisburys understandably took a dim view of an offer based on $1.55 per square foot, especially since the listing agreement stated a selling price based on $2.25 per square foot. Dorothy said there was some discussion about it and that "it was hassled back and forth a few times" with Ziesing. Finally they were persuaded to accept $1.65 per square foot. Ziesing testified, five years later, that they told him they were in no hurry to move because their son's automobile was stored in the garage. He further testified that when he presented the amended contract to Yerkie, he (Yerkie) "didn't feel that he would apply for it [zoning], that it wasn't yet ready at this time to be applied for." He doubted he could get it "the way he wanted it" at that time. In June 1967 Ziesing said he was asked by Dorothy "were we going in for zoning, and if not why not."

In August 1967 the Salisburys consulted counsel who, on 18 August, sent to Yerkie a letter from which we quote:

> "In view of the fact that no deposit[1] was made as provided by the contract and no efforts made to rezone the property as required, I have advised Mr. and Mrs. Salisbury that in my opinion the contract has been abandoned and is void and is of no effect as of August 15th, 1967."

Except for the fact that Yerkie recorded the contract in February 1968 things drifted on for almost another year. In July 1968 he asked the Salisburys to sign an application to reclassify the property from R-R to C-2. They refused. Two years and three months later Yerkie filed a bill of complaint praying the specific enforcement of the contract of sale. We found in the transcript an affidavit by Ziesing and one by Yerkie. A letter of trans-

---

1. The deposit was actually paid to the broker. We assume he is still holding it.

mittal suggests they were filed at the request of the chancellor, Parker, J. We quote from Ziesing's affidavit:

"That it is your Affiant's belief that the contract was ultimately accepted by the Salisburys when they were assured by your Affiant, after consultation with John W. Yerkie, Jr., that they would not have to leave the property within a period of one year to one year and one-half, and that in order to assure this, *the petition for rezoning referred to in the contract would not be filed until it was agreeable with them."* (Emphasis added.)

Now we quote from Yerkie's affidavit:

"That at the time your Affiant entered into the contract, and as a condition to entering into the contract, it was agreed and understood between your Affiant and Homer L. and Dorothy I. Salisbury, Defendants in the above-captioned action and the sellers under said contract, that they were in no hurry to have the property rezoned and would extend the time to apply for the rezoning; *that there was no specific agreement between the parties as to when the rezoning would be applied for other than it would be at a time mutually acceptable to both parties* * * *." (Emphasis added.)

What follows is an excerpt from the cross-examination of Yerkie at the hearing before the chancellor, R. B. Mathias, J., on 6 July 1971:

"Mr. Yerkie, wasn't it understood under your contract that if you didn't file within six months the contract was void?

"A. Was it understood?

"Q. Yes. Wasn't that part of the contract, part of the deal?

"A. If I didn't file in six months it was void?

"Q. Yes.

"A. No.

"Q. *Well, when would it have been void?*

"A. *I don't know when it would have been void.*"

* * *

"Q. There is nothing legally requiring you to file at any time; isn't that right? There is no legal requirement in the contract you have to file?

"A. *I don't think there is anything in the contract that states I have to file any certain day.*" (Emphasis added.)

We quote from the oral argument that took place after the evidence had been concluded:

"THE COURT [Judge Mathias] : I want you to tell me, Mr. Edwards [Yerkie's counsel], just as simple as you can where the parties stand with reference to this explanation of when this zoning should be applied for. You have talked about parol evidence, and in his affidavit and on the stand he said when the parties mutually agreed on the application for zoning is when they should have done it. *Now, when is that time?*

"MR. EDWARDS: Now, see, here is where I really have to call on the equity side of the law, because it is obvious, as I developed and explained the case, that the parties did intend one to sell land and one to take money for it, that they did agree to apply for zoning, and they did agree that the zoning petition would be at a time convenient to themselves.

"THE COURT: When is that time, from the evidence I have got?

"MR. EDWARDS: Well, —

"THE COURT: *When is it? Will it ever be?*

"MR. EDWARDS: *I don't know.*

"MR. PYLES [Counsel for the Salisburys]: *That does it.*

"THE COURT: We don't need any explanations and comments.

"MR. PYLES: I am sorry." (Emphasis added.)

Dorothy testified, on cross-examination, that in the summer of 1970 she and Homer agreed to sell the property to another purchaser for $47,500, subject to the outcome of the instant case and to a change in the zoning classification, the application for which they have signed.

Judge Mathias dismissed Yerkie's amended bill of complaint and from his decree filed on 7 July this appeal was noted.

At least twice in the recent past we have restated an ancient principle of law that today seems more honored in the breach than the observance, i.e., a real estate broker is a fiduciary and when a seller employs a broker to sell his property he bargains for the disinterested skill, diligence and zeal of the broker for his own exclusive benefit. *Sellner v. Moore,* 251 Md. 391, 398 (1968), and *One Twenty Realty Co., Inc. v. Baer,* 260 Md. 400, 406 (1971). We are not persuaded that Ziesing has displayed much in the way of skill and we are quite unwilling to say that whatever diligence and zeal he exercised was for the exclusive benefit of the Salisburys. Indeed the record strongly suggests an earlier and continuing allegiance to Yerkie.

The Salisburys take the position that because the contract is silent in respect of the time within which the zoning must be accomplished it is too indefinite to be specifically enforced. Yerkie, on the other hand, says it makes no difference because, in such circumstances, the provision will be interpreted to mean that it must be accomplished within a reasonable time, citing *Trotter v. Lewis,* 185 Md. 528 (1946). In the case at bar, however,

we think the words "Property purchased subject to being zoned C-2" must be read with the words (fixing the time of settlement) "Within 100 days after final zoning approval." One soon perceives that whatever might be said to be a reasonable time within which to initiate the zoning procedures Yerkie was under no compulsion to settle for the property until after *final zoning approval.* There is little doubt that it could take as long as five years to obtain a final decision, *e.g., Garrett Park v. Montgomery County Council,* 257 Md. 250 (1970). But a final decision might not be final "approval" and, in those circumstances, Yerkie could claim, with some justification, that he was entitled to wait two years and then start all over again. Prince George's County Charter, Sec. 708 (b). The property has already been insulated from the market for about five years and were Yerkie to prevail here the Salisburys could well be kept dangling for another five, or ten, or more years.

Yerkie insists, in his brief, that the contract was definite, that he had agreed to apply for rezoning whenever it was agreeable to the Salisburys. The only question, therefore, so he argues, was when they would find it convenient for him to do so. The language of the contract is hardly susceptible of such an interpretation and we have found no extrinsic evidence which would justify such a conclusion. Yerkie, in his affidavit, said there was no specific agreement concerning time, other than it would be a time mutually acceptable to *both* parties. So whether or not the time might have been agreeable to the Salisburys he could nevertheless have hung back until he also found it agreeable. His testimony makes this entirely clear. Ziesing's statements are somewhat inconclusive. He mentions a period of a year to a year and a half, or until "it was agreeable with them." Even counsel could not say when it would be, if ever. The Salisburys, it will be recalled, were upset because Yerkie had *not* taken any action within a year.

Familiar to all is the rule that to be specifically enforced a contract must be clear, certain, and definite in

all of its material provisions, not the least of which is the time for performance. It must not leave a material and essential term or element for future negotiation and settlement. *Paape v. Grimes,* 256 Md. 490 (1970), *Gilbert v. Banis,* 255 Md. 179 (1969), *Lambdin v. Przyborowski,* 250 Md. 108 (1968), and the authorities cited in those three cases. For all that has been said we are satisfied that the contract under consideration does not have the credentials a court of equity requires.

Although the chancellor relied mainly on his finding that Yerkie was "guilty of laches," he also concluded that the contract was indefinite and impossible of construction. Since we agree with his subsidiary conclusion there is no need to consider the question of laches, but because we have chosen not to do so it must not be thought that we see error in his finding. Nor do we think it necessary to deal with the contention that the rule against perpetuities has been breached, but for a discussion of the rule, in a similar context, *see Commonwealth Realty Corp. v. Bowers,* 261 Md. 285 (1971).

We think it is fair to say, and perhaps it ought to be said, that this dispute can be traced to Ziesing's inept draftsmanship. No careful attorney would tolerate such slapdash phrasing of a provision relating to zoning. Indeed the framing of these provisions is usually approached with care and caution. Even for the tyro there are form books readily available. *See, e.g.,* Warren, Markuson and Glickman, *Warren's Forms of Agreements* § 13 (1971). Brokers and their salesmen ought to have sense enough to realize that many contracts of sale are important legal documents, the preparation of which should be left to lawyers. Quite often there is a great deal more to the drafting of a contract for the sale of land than filling in the blank spaces on a printed form.

*Decree affirmed.*
*Costs to be paid by appellant.*