# Quechee Lakes Rental Corporation v. Stephen J. Boggess and Mary B. Boggess

[608 A.2d 39]

No. 89-457

Present: Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.

Opinion Filed April 3, 1992

*P. Scott McGee* of *Hershenson, Carter, Scott & McGee*, Norwich, for Plaintiff-Appellant.

*Michael F. Hanley* of *Plante, Hanley & Gerety, P.C.*, White River Junction, for Defendants-Appellees.

**Johnson, J.** Plaintiff, Quechee Lakes Rental Corporation (QLRC), a licensed real estate corporation in Vermont, appeals from a superior court order denying its claim for a broker's commission for the sale of defendants' residential property. The trial court held that plaintiff was not entitled to receive a broker's commission because it breached its fiduciary duty to defendants, Mary and Stephen Boggess. We affirm.

On November 9, 1985, Mary Boggess, the owner of a Quechee Lakes condominium unit, and her husband Stephen entered into a listing contract with QLRC to sell the condominium. The Boggesses agreed to pay QLRC an eight percent broker's commission if it sold the furnished unit within a year for $289,500. In May, 1986, Maureen Bacon, a licensed real estate salesperson employed by QLRC, showed the property to a prospective buyer who offered to purchase the condominium at less than the full listing price.

A series of negotiations followed. On May 30, 1986, the buyers' first offer, for $275,000, lapsed because it was not timely accepted. During a telephone conversation with Maureen Bacon, Stephen Boggess falsely stated that he had received a $280,000 offer for the property. Bacon asked Boggess if he would consider a $281,000 offer. Boggess indicated that he would consider, but not necessarily accept, such an offer. Bacon, although not authorized to do so, then told the buyers that Boggess would accept a $281,000 offer. In response, the buyers offered $281,000 for the unfurnished condominium, but included a mortgage contingency. The Boggesses were hesitant to accept this offer. After Boggess informed Bacon that he was considering taking the unit off the market, Bacon telephoned the buyers and suggested that they needed to make a full purchase price offer without contingencies, if they wanted to be assured of the purchase.

Because the buyers were hesitant, Bacon and a QLRC vice-president, Edward Elliott, informed the buyers that if they made a $289,500 offer, QLRC would purchase the condominium's furnishings for $8,500 upon closing. This would effectively make the buyers' $281,000 offer a full-price offer. The buyers

agreed to this arrangement, and on June 23, 1986, they offered $289,500, without contingencies, for the condominium. The Boggesses were never told that a collateral arrangement was made between the buyers and the realtors regarding the condominium's furnishings, and the realtor's commission was not decreased as a result of the reduction in the sales price from $289,500 to $281,000. The June 23 offer was sent to Boggess on June 26, 1986. He began to express concerns about taxes which would result from the property's sale in 1986, and asked Edward Elliott to delay closing until January, 1987. The buyers agreed, and, on July 15, 1986, Elliott sent a contract to Boggess modifying the closing date. Boggess, however, did not return the contract.

In late July, Boggess consulted with an attorney for his mortgage brokerage firm in Massachusetts, and based on this consultation, made a counteroffer. Among other things, the counteroffer increased the amount of the buyers' security deposit, transferred responsibility for the deposit to the seller, required the buyers to execute a note and mortgage, and reserved "[i]n the sellers' sole and uncontrolled discretion" the election to reject the sale by October 12, 1986. The counteroffer was sent to the buyers on July 31, 1986. The buyers were "quite shocked" when they received the counteroffer "on or about August 2 or 3, 1986." They concluded that Boggess did not want to sell and would continue to throw "monkey wrenches" into further attempts to reach agreement. That same day, during a telephone conversation with Bacon, the buyers expressed their frustration and anger about Boggess's counteroffer.

On August 4, 1986, Elliott contacted Boggess's attorney, Raffaele Terino, and informed him that Boggess had turned down a full-price offer and could be liable for the broker's fee. That same day, Boggess responded and agreed to rescind his counteroffer, and accept the buyers' offer. One day later, on August 5, Elliott informed Bacon that Boggess accepted the buyers' offer. In the meantime, however, Bacon had already arranged to show the buyers some other Quechee Lakes condominium units on August 8. Bacon did not inform the buyers of Boggess's change of heart immediately because she did not wish to expose the buyers to further aggravation. Instead,

aware of the anger expressed by the buyers, Bacon decided to wait three days until August 8, to give this information to the buyers, when they were scheduled to return to Quechee to look at other units. Bacon did not obtain Boggess's consent to wait three days to inform the buyers. When Bacon did inform the buyers that Boggess changed his mind, she did so in such an indirect manner that it made no impression on them. The trial court found that the actions of both Bacon and Elliott "reflect[ed] the realtors' strong desire to keep the [buyers] interested as customers."

During the buyers' visit on August 8, QLRC showed them another more expensive unit, owned by QLRC's parent, Quechee Lakes Corporation, and offered a discount of $55,000 on the full price as a "furniture discount." The buyers decided to purchase this condominium from QLRC for $385,000 minus the discount. QLRC received a larger broker's fee for this sale than the expected fee for the sale of the Boggess unit. Boggess was not informed that the buyers had purchased another unit until he received a letter from QLRC dated August 15, 1986.

The trial court concluded, based on the foregoing facts, that QLRC breached its fiduciary duty by failing to disclose its interest in the sale and reduce its commission, It also concluded that QLRC was negligent in failing to immediately communicate the seller's change of heart regarding the buyers' latest offer. Accordingly, it denied QLRC its commission. QLRC argues on appeal that it did not breach its fiduciary duty to the Boggesses and, in any event, the Boggesses were not harmed because QLRC produced a buyer willing to purchase the property on their terms.

We agree that QLRC breached its fiduciary duty to the Boggesses, but we base our opinion on a ground not specified by the trial court. In doing so, we do no violence to the trial court's findings of fact or our proper function as an appellate court. The trial court's findings of fact were supported by the evidence. We affirm because QLRC failed to communicate material information from its principal to the buyers and acted in a manner antagonistic to the interests of its principal. The trial court characterized this behavior as negligence, but, however it is labeled, it defeats plaintiff's claim.

■ Under a listing agreement in Vermont, a real estate broker is an agent of a seller and owes the seller the duties of a fiduciary. Vermont Real Estate Commission Rule 30(a). A real estate broker, as an agent, must act "with the utmost good faith and loyalty for the furtherance and advancement of the interests of his [or her] principals." *Prouty v. Blanchard*, 93 Vt. 206, 209, 106 A. 831, 833 (1919). A person employing a broker to negotiate a sale "bargains for the disinterested skill, diligence and zeal of the broker for his [or her] own exclusive benefit." *Yerkie v. Salisbury*, 264 Md. 598, 603, 287 A.2d 498, 501 (1972). Part of this duty requires that a broker disclose all matters that are material to, and might affect, the principal's actions. *E.A. Strout Realty Agency, Inc. v. Wooster*, 118 Vt. 66, 70, 99 A.2d 689, 692 (1953).

■■ As a fiduciary, QLRC had a duty to disclose to its principals any material information relevant to the sale. Contrary to the trial court, however, we conclude that the material breach to be drawn from the facts is Bacon's failure to immediately communicate to the buyers that Boggess had rescinded his counteroffer and was willing to accept the last offer made by the buyers. "It is the general rule that a real estate agent must act in compliance with the instructions of his principal." *Id.* In other words, a broker cannot be "controlled by his own judgment, rather than that of his principal." *Id.* Here, Bacon waited three days to tell the buyers that Boggess rescinded his counteroffer and was willing to accept their offer, and then did so in such an indirect manner that it made no impression on them. As the trial court found, Bacon failed to make Boggess's change of heart clear to the buyers. To make matters worse, Bacon's reason for waiting was out of concern for the buyers, and not in furtherance of some purpose consistent with that of her principals. We can think of few matters more important to be immediately disclosed on behalf of a seller than acceptance of an offer, and Bacon's failure to disclose it breached her fiduciary duty to the Boggesses. Had QLRC acted conscientiously and promptly in communicating the seller's agreement to accept buyers' price, the sale might have gone through and this lawsuit avoided. This conclusion cannot be avoided on any view of the underlying facts.

Admittedly, Stephen Boggess was a difficult client. He is not free from fault,* but neither is QLRC. Throughout the negotiations, QLRC exacerbated the situation by not dealing with Boggess in a straightforward manner. Bacon gave the buyers a false impression that Boggess would accept an offer for $281,000. Later, when Boggess was considering taking the property off the market because he felt he could list the property for a higher price, Bacon suggested to the buyers that they make a full price offer without contingencies. When the buyers were hesitant, the brokers offered to make up the difference between $281,000 and the full price upon closing, without disclosing that they were in on the transaction. Later, QLRC's actions were directed at retaining the buyers as customers, rather than selling the Boggess property, and their efforts were successful. The buyers eventually bought a property, which was owned by QLRC's parent corporation, Quechee Lakes Corporation, at a substantial "discount." Although not every questionable action by QLRC rose to the level of a breach of fiduciary duty, those actions demonstrate the climate in which the breach occurred. QLRC shares with Boggess responsibility for creating that climate.

QLRC argues that, whatever its conduct, it produced a buyer prepared to purchase the property at the full listed price, and, therefore, it is entitled to its commission. We are not willing to hold, however, that QLRC's breach of its fiduciary duty, in the backdrop of this case, carries no penalty. We apply the well-settled rule of agency law that an agent who conceals material information from a principal, or does not otherwise comply with the principal's intentions, is not entitled to collect a commission on the sale. Restatement (Second) of Agency § 469 (1958); see *Janes & Jacob Real Estate, Inc. v. Dave's Automotive, Inc.*, 150 Vt. 162, 165, 552 A.2d 380, 382 (1988). Comment a of § 469 of the Restatement provides an explanation of this rule:

> An agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in an-

---

* Boggess's counterclaim for damages from the loss of the sale of the property was denied by the trial court, which found that Boggess was the "architect of his own undoing." No appeal was taken from the judgment on the counterclaim.

tagonism to or in competition with the principal in a transaction is not entitled to compensation which otherwise would be due him because of the transaction. This is true even though the conduct of the agent does not harm the principal, and even though the agent believes that his conduct is for the benefit of the principal and that he is justified in so acting.

In *Moore & Co. v. T-A-L-L, Inc.*, 792 P.2d 794, 800 (Colo. 1990), the Colorado Supreme Court adopted this section of the Restatement when it held that a broker's breach of a fiduciary duty to a seller results in a forfeiture of the right to a sales commission regardless of whether the seller suffered any harm, even if the broker has not engaged in fraud, self-dealing or taken a secret profit. In that case, a broker failed to disclose a substantially higher offer made to him prior to closing, but after a contract for sale was made with a buyer. *Id.* at 797. The broker disclosed the details of the higher offer to the buyer under contract, and orchestrated meetings between the contracted buyer and the new buyer, all without disclosure or authorization from his principal. *Id.* The agent's disloyalty left the principal without information on which it might have renegotiated the sale. *Id.* Although the principal received a full price offer, the court upheld the trial court's order denying the broker's right to a commission on the sale. *Id.* at 800. The court stated: "To hold otherwise would reward the broker for conduct violative of the broker's basic duty to the seller." *Id.*

■ Moreover, the broker's fiduciary duty to the seller does not end when the broker procures a ready, willing and able buyer on the seller's terms. Broker misconduct occurring subsequent to the broker's production of a buyer has been held to violate the broker's fiduciary obligation. See *id.* at 799 (where agency agreement authorizes broker to sell property, broker's fiduciary obligation continues through closing); *Wallace v. Odham*, 579 So. 2d 171, 175 (Fla. Dist. Ct. App. 1991)(breach of fiduciary duty provided ground to bar commission even though acts of breach occurred after broker abandoned agency contract). Therefore, QLRC was not relieved of its duty of loyalty to the sellers after it produced a buyer.

■■ We are persuaded by the reasoning of *Moore* that certain basic duties are inherent in a real estate contract. A seller

who contracts with a real estate broker should be able to expect loyalty as well as price. QLRC's failure to inform may well have been the single most significant reason the sale did not materialize, given the buyers' interest in completing a sale. Therefore, we hold that when a real estate broker breaches a fiduciary duty to a principal, the broker is not entitled to receive a commission if some potential harm to the principal may have been caused by the breach, even though no actual harm is shown.

*Affirmed.*

**Dooley, J.,** dissenting. If the trial court had accepted the theory adopted by the majority, I would be tempted to affirm and join the majority opinion. The trial court did not accept this theory for good reasons, and the majority opinion is not consistent with the standard for reviewing the trial court's findings and decision. As a result of the majority's decision, the sellers, whose manipulations were the sole cause of their losing a sale on terms they set, escape the legal consequences of their actions. I dissent.

The majority characterizes the trial court decision as concluding that the brokers breached their fiduciary duty by "failing to immediately communicate the seller's change of heart regarding the buyers' latest offer." The decision is then restated as "QLRC failed to communicate material information from its principal to the buyers and acted in a manner antagonistic to the interests of its principal."

In fact, the trial court found a breach of fiduciary duty, that would deprive the brokers of their commission, only in their failure to disclose the "side deal" for the furniture. The court found that the failure to inform the purchasers of the sellers' changed position was "negligence" with no "disloyalty, fraud or bad faith." It also found that Stephen Boggess was the architect of his undoing, that the buyers were "exasperated and mistrustful" of him and that independent of any actions of the broker, "they decided to have no further dealings" with the sellers.

The majority recognizes that its decision rests on conclusions not drawn by the trial court. It states, however, that it does "no violence to the trial court's findings of fact." I strongly dis-

agree. A central part of the majority's analysis is that if the broker had immediately communicated the sellers' change of heart "the sale might have gone through and this lawsuit avoided." This is directly contrary to the trial court's finding that "Q.L.R.C. and its agents . . . were not the cause of Boggess' failure to sell [the condominium] . . . [i]ndependently of any actions of Q.L.R.C., [the buyers] . . . decided to have no further dealings with the defendant." As the majority states, the trial court's findings, including this one, are supported by the evidence. It is improper for this Court to ignore the trial court's finding.

I agree with the majority that the applicable law is found in § 469 of the Restatement (Second) of Agency. It provides that "[a]n agent is entitled to no compensation for conduct which is disobedient or which is a breach of his duty of loyalty . . . ." As the comment quoted by the majority points out, the duty of loyalty is breached if the agent "acts for his own benefit or for the benefit of another in antagonism to . . . the principal." *Id.*, Comment a. There is nothing in the section or the comment to suggest that negligence alone, without improper motive, creates a breach of duty of loyalty. The trial court found as fact that the broker did not act for its own benefit, and that factfinding must be upheld if not clearly erroneous. See, e.g., *Musselman v. Southwinds Realty, Inc.*, 146 Ariz. 173, 175, 704 P.2d 814, 816 (1985) (whether breach of fiduciary duty occurred is a question of fact).

What the majority has really concluded is that the broker was self-dealing in order to earn a higher commission on a sale of another condominium to the buyers. This is directly contrary to the trial court's finding that the broker did not switch the buyers to another condominium to earn a higher commission. There was evidence that the buyers were so angry with the sellers because of the sellers' actions that they would not even drive by the condominium on which they had made an offer. The broker could fairly surmise that fueling that anger was pointless and might further injure the principal. It was not clearly erroneous for the trial court to conclude that the broker's delay in notifying the buyers, and the method of notification, was negligence but was not induced by improper motives and was not disloyal.

There is a second reason why this creation of a new theory on appeal to deny the commission is improper. The broker discharged its obligation under the listing agreement when it produced a buyer "ready, willing and able" to purchase on the terms specified by the seller. See *Arjay Properties, Inc. v. Hicks*, 143 Vt. 335, 338, 465 A.2d 777, 778–79 (1983). If a sale doesn't occur because of the sellers' "fault or inability to complete it," the broker is still entitled to a commission. *Pond v. Carter*, 126 Vt. 299, 305, 229 A.2d 248, 252 (1967). Under the majority's theory, the breach of fiduciary duty occurred after the seller had rejected the full-price offer of the buyers and after the buyers had irrevocably decided to have no further dealings with the seller.

Although even a breach of fiduciary duty that does not result in harm may prevent recovery of the commission, there must first be a "duty" that was breached. At best, the presence of a duty here is arguable and depends on a finding, not made by the trial court, of an agency relationship that continued beyond the rejection of the full-price offer. On this point, neither the Colorado nor the Florida case cited by the majority is helpful. The Colorado opinion addresses the obligation of the broker when a contract of sale specifically provides that the broker is to sell the property. *Moore & Co. v. T-A-L-L, Inc.*, 792 P.2d 794, 799 (Colo. 1990). The Florida case involves a listing agreement that "requires the broker not only to find a purchaser but actually to effect the sale or procure a binding contract of purchase." *Wallace v. Odham*, 579 So. 2d 171, 174 (Fla. Dist. Ct. App. 1991). The listing agreement in this case did not give the broker the power to sell, nor did it require an actual sale for the broker to earn a commission. I do not believe we should create a duty that goes beyond the point where the broker earned the commission.

The sale of real estate through brokers has been a fertile area for litigation in this state and elsewhere. See Zeigler, *Brokers and Their Commissions*, 14 Real Est. L.J. 122, 122 (1985) (real estate brokers' commission disputes "have given rise to more litigation in the history of American law than just about any other type of conflict"). In fact, the relationship between brokers and buyers and sellers of real estate is fraught with potential conflict. A thoughtful analysis of the role of the real estate broker points out:

The broker attempting to fulfill his duties to both buyers and sellers confronts a seemingly unresolvable dilemma. The obligation to hold the interest of his principal above all others conflicts with his public responsibility to deal fairly with nonprincipals in real estate transactions. Although most transactions are concluded without complaint from either party, the thoughtful broker should realize that only the rare conveyance does not involve at least a technical violation of law or regulation.

Currier, *Finding the Broker's Place in the Typical Residential Real Estate Transaction*, 33 U. Fla. L. Rev. 655, 674 (1981). The broker made an attempt to deal fairly with the potential buyer despite roadblocks put up by the seller. The majority holds that a technical violation of law, made negligently and without improper motive resulting in no harm to the seller, deprives the broker of a commission. The rule the majority creates encourages a seller to search for some harmless, innocent violation of a broker's duty as a justification for denying a commission to a broker who has produced exactly the sale that the seller seeks. The result is neither just in this case nor wise as a matter of general policy. Accordingly, I dissent.

I am authorized to state that Chief Justice Allen joins in this dissent.