ATTORNEYS FOR APPELLANT
William Edward Jenner
Darrell M. Auxier
Madison, Indiana

ATTORNEY FOR APPELLEES
Robert C. Price
Bloomington, Indiana

In the
## Indiana Supreme Court

FILED
Apr 29 2008, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

No. 53S01-0711-CV-515

TONDA BETH NICHOLS,

*Appellant (Plaintiff below),*

v.

REX DAVID MINNICK &
R. DAVID MINNICK, INC., D/B/A
COMMERCIAL PROPERTIES,

*Appellees (Defendants below).*

Appeal from the Monroe Circuit Court, No. 53C01-0206-PL-01056
The Honorable E. Michael Hoff, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 53A01-0606-CV-268

**April 29, 2008**

**Boehm, Justice.**

We hold that a broker who breaches his fiduciary duty to disclose material information to his client loses his right to receive a commission for his services.

### Facts and Procedural History

In 1998, Bedford Hideaway Lounge, Inc. ("BHL") owned and operated the Hideaway Lounge, "a gentleman's club and bar" in Bedford, Indiana. In the spring of 1998, Tonda Beth

Nichols, the owner of BHL, encountered some health problems and engaged real estate broker Rex David Minnick to sell BHL. In her initial meeting with Minnick, Nichols stated that she wanted $300,000 for BHL. At a second meeting, Minnick suggested $240,000 to $250,000 as an appropriate price. Nichols signed a preprinted real estate listing agreement giving Minnick the exclusive right to sell BHL for $245,000 and providing for a ten-percent commission to Minnick.

Minnick showed the property to only one potential buyer, James Blickensdorf. Minnick reported to Nichols that Blickensdorf would offer $225,000 for BHL, but was unable to pay the full price in cash. Minnick recommended that Nichols accept the offer, and Nichols testified that she relied on Minnick's "judgment" and "expertise" in deciding to agree.

Nichols and Blickensdorf entered into a "Stock Purchase Agreement" calling for Nichols to transfer 999 of BHL's 1000 shares to Blickensdorf, and the remaining share to "Charles A. East," whose relationship to this transaction is not clear from the record. The agreement called for Blickensdorf to make a $25,000 cash down payment and execute a five-year installment note for $177,500. The agreement recited that Blickensdorf "is paying the commission owed by [Nichols] to R. David Minnick" and would receive a credit for the remaining $22,500 of the $225,000 purchase price. Nichols agreed to transfer her BHL shares upon payment in full of the installment note.

The Stock Purchase Agreement provided that Blickensdorf would assume management of the Hideaway Lounge at closing, which took place on July 16, 1998. Blickensdorf soon experienced problems. He hired underage dancers, failed to pay taxes when due, bounced checks, and eventually failed to make payments due on the installment note. During this time, without Nichols's knowledge, Minnick had advanced money to Blickensdorf for taxes, utilities, and operating expenses.

On June 23, 2000, in response to a letter from Nichols's attorney declaring a default on the note, Blickensdorf paid the balance owed on the installment note. Nichols then transferred all her shares of BHL to Blickensdorf. In a second transaction, without Nichols's knowledge, Blickensdorf transferred the BHL shares to Richards Properties, Inc., owned ten percent by Minnick and ninety percent by Richard Evans, Minnick's employee. Minnick testified that

Richards Properties was formed to purchase BHL and hopefully "turn the business around." In January 2001, Minnick became the owner of ninety-five percent of Richards Properties.

At some point along the way, Richards Properties surveyed the real estate held by BHL and learned that the parking lot adjacent to the Hideaway Lounge was owned personally by Nichols, not by BHL. In May 2001, Blickensdorf and Richards Properties sued Nichols, alleging that she had failed to convey the parking lot to the Hideaway Lounge. Nichols, who had continued to allow customers to park on the land without charge, testified that she was "confused" by the lawsuit, and had "no idea" what Richards Properties was. Through discovery in this parking lot litigation, Nichols learned for the first time that Minnick had provided funds for Blickensdorf to operate the business, had funded the payoff of the purchase price, and through Richards Properties now owned BHL and operated the Hideaway. She testified that she also learned that Minnick had lent Blickensdorf $15,000 of the $25,000 down payment for the purchase of BHL, and had agreed to defer payment of Minnick's $22,500 commission. In response to the suit, Nichols began charging rent for use of the parking lot. On February 1, 2002, Blickensdorf and Richards Properties voluntarily dismissed the parking lot complaint without any payment or other consideration from Nichols.

On June 12, 2002, Nichols sued Minnick for the $22,500 commission on the sale to Blickensdorf. Nichols's complaint alleged that Minnick used Blickensdorf as a "straw man" to obtain control of BHL and breached his fiduciary duties by failing to disclose his loans to Blickensdorf. Minnick admitted lending funds to Blickensdorf but denied using Blickensdorf to obtain BHL. Minnick explained that only after BHL was failing under Blickensdorf's management had he created Richards Properties in hopes of turning the business around. His motivation was to avoid repossession by Nichols, which would have destroyed the prospect of repayment of his loans to Blickensdorf.

At trial, Minnick described Blickensdorf as a "friend" and testified that he and Blickensdorf had been involved in a prior real estate deal in which Blickensdorf wanted to purchase a Blimpie's restaurant in Bloomington. Blickensdorf was "short part of the down payment," and Minnick had provided a loan for the acquisition which Blickensdorf had since repaid in full.

The trial court found that Minnick breached his fiduciary duty to Nichols by failing to disclose "Blickensdorf's financial weakness." However, the trial court concluded that disgorgement of Minnick's commission was not an appropriate remedy because Nichols did not prove that she suffered monetary damages. The trial court also found that Minnick's breach was not serious because Nichols "had reason to know" of a relationship between Minnick and Blickensdorf. The Court of Appeals affirmed the trial court, concluding that Nichols had not challenged any of the trial court's findings. The Court of Appeals did not consider whether the trial court applied the wrong legal standard to its findings. Nichols v. Minnick, No. 53A01-0606-CV-268, slip op. at 7 (Ind. Ct. App. Apr. 13, 2007). We granted transfer. Nichols v. Minnick, 878 N.E.2d 218 (Ind. 2007) (table).

## Standard of Review

We disturb a trial court's findings and judgment only when they are clearly erroneous. Ind. Trial Rule 52(A). Findings of fact are clearly erroneous when they have no factual support in the record. Yanoff v. Muncy, 688 N.E.2d 1259, 1262 (Ind. 1997) (citations omitted). A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts. Id.

## I. An Agent's Duty to Disclose

Minnick was acting as agent for Nichols. A real estate broker representing a seller has the duty to "[disclose] to the seller . . . adverse material facts or risks actually known by the [broker] concerning the real estate transaction." Ind. Code §§ 25-34.1-10-9.5, -10(a)(3)(C) (2004). The parties agree that a buyer's creditworthiness is material to a real estate transaction and therefore a broker must disclose to the seller any loans the broker has made to the buyer to finance the purchase. The trial court found that Minnick did not disclose his loan of $15,000 for the down payment. The trial court also found that "[t]he evidence is conflicting as to whether or not Minnick told Nichols that Minnick had loaned Blickensdorf the commission." The trial court concluded that the deferral of the commission did not support Nichols's claim to recover the commission. The court reasoned that

> Nichols had reason to know of a relationship between Minnick and Blickensdorf from the provision in the sales document that Blickensdorf would pay Minnick's commission. In light of that, Minnick's action in concealing that he loaned Blickensdorf $15,000.00 for the down payment was not a serious violation of a duty of

4

loyalty or seriously disobedient conduct such that Minnick should be ordered to repay the commission he received to Nichols.

We agree that the evidence is conflicting as to whether Nichols knew that Blickensdorf gave a note rather than cash for Minnick's commission. Minnick testified that Nichols and Blickensdorf "both knew" that he was an agent for the other. That is an insufficient explanation. Minnick engaged in two transactions with Blickensdorf incident to the initial purchase of BHL. Minnick agreed to accept a note rather than immediate payment of $22,500 representing the commission that Minnick was to receive from Nichols. Second, Minnick lent $15,000 to supply sixty percent of Blickensdorf's down payment to Nichols. Even if Nichols knew of the dual agency, knowledge that Minnick was acting as Blickensdorf's agent is quite different from knowledge that Minnick had lent Blickensdorf the bulk of the down payment. The trial court found that if Nichols had known of the $15,000 loan, "Nichols would have had additional very important information about the credit worthiness of the buyer she was about to extend credit to. Nichols might very well have decided not to accept Blickensdorf's Installment Promissory Note for $177,500." By failing to disclose the $15,000 loan to Nichols, Minnick violated his duty to disclose material information known to him, namely, Blickensdorf's lack of cash. Presumably as events unfolded this lack of financial stability contributed to BHL's later struggles.

## II. Remedy for Breach of the Duty to Disclose

Both tort damages and restitution are available remedies for a breach of the duty to disclose material information. Minnick argues that neither remedy is appropriate because Nichols suffered no losses. That is an appropriate response to the claim for damages but not to the claim for an equitable remedy.

Compensatory tort damages "are designed to place [the plaintiff] in a position substantially equivalent in a pecuniary way to that which he would have occupied had no tort been committed." Restatement (Second) of Torts § 903 cmt. a (1979); see also id. § 974 ("One standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation."). Restitution, on the other hand, may be measured by the defendant's gain and is therefore appropriate even when the plaintiff has suffered no demonstrable harm. Moore & Co. v. T-A-L-L, Inc., 792 P.2d 794, 799–800 (Colo. 1990) (fact that

5

seller sustained no actual damages does not exonerate broker); Miller v. Berkoski, 297 N.W.2d 334, 341 (Iowa 1980) (disgorgement does not depend upon harm to principal); Goldberg Realty Group v. Weinstein, 669 A.2d 187, 190 (Me. 1996) (same); Quechee Lakes Rental Corp. v. Boggess, 608 A.2d 39, 43 (Vt. 1992) (same); see Silverman v. Pitterman, 574 So.2d 275, 276–77 (Fla. Dist. Ct. App. 1991) (not considering harm); Owen v. Shelton, 277 S.E.2d 189, 192 (Va. 1981) (same). But see Ziswasser v. Cole & Cowan, Inc., 164 Cal. App. 3d 417, 425 (1985) (requiring disgorgement only when agent displays bad faith, disloyalty, or fraud).

Harm to the plaintiff is not required for several reasons. First, disgorgement may be "the only available remedy" for an agent's breach of fiduciary duty because harm to the principal is difficult to prove. Restatement (Third) of Agency § 8.01 cmt. d(2) (2006). Second, requiring disgorgement removes the temptation for an agent "to undertake conduct that breaches the agent's fiduciary duty in hope that no harm will befall the principal or that, if it does, the principal will be unable to establish it or unable or unwilling to expend the necessary resources required to litigate the question." Id. Finally, by promoting the agent's integrity, the disgorgement rule facilitates the principal's trust on which the fiduciary relationship is grounded. See Owen, 277 S.E.2d at 192 ("The price of a violation of the duty to disclose is forfeiture of the broker's right to compensation. This rule illustrates the high regard the law holds for the fiduciary relationship, founded as it is upon one man's trust in the integrity and fidelity of another. The purpose of the rule is more prophylactic than remedial; it is applied, not to compensate the principal for an injury, but rather to discipline the fiduciary in the conduct of the office entrusted to him.") (citations omitted).

Applying these general principles, the Court of Appeals has held that when a broker breaches his duty of disclosure, restitution takes the form of disgorgement of the broker's right to a commission. Smitley v. Nau, 143 Ind. App. 113, 116, 238 N.E.2d 681, 683 (1968) ("The law is well settled in Indiana that a broker cannot recover a commission if, unknown to his principals, he has an adverse individual interest in the transaction." (citing H.H. Woodsmall & Co. v. Steele, 82 Ind. App. 58, 60, 141 N.E. 246, 247 (1923))).

In this case, the trial court concluded that neither an award of tort damages nor disgorgement was appropriate. The trial court found that "Nichols has not proven that she suffered

monetary damage as a result of Minnick's actions as her agent in the sale of her business." We agree that the record supports this finding. Presumably, Nichols could have attempted to show loss of a better deal, but there is no evidence that this occurred. Blickensdorf was the only person to look at the property, and the only estimates of BHL's value are Minnick's listing price and what Nichols hoped to get out of the deal. It is speculative on this record whether a different buyer would have offered more for BHL. Indeed, Minnick suggests there would have been no willing buyer at all and points to operating losses BHL incurred after the sale.

Although we agree that there is no proof of loss to support tort damages, we do not agree with the trial court's conclusion that disgorgement is not required. The trial court based its judgment on its finding that Nichols had reason to know of the relationship between Minnick and Blickensdorf, and its conclusion that Minnick's failure to disclose the $15,000 loan for the down payment "was not a serious violation of a duty of loyalty or seriously disobedient conduct such that Minnick should be ordered to repay the commission he received to Nichols." As explained above, a fiduciary is required to disgorge any benefit from failure to disclose material information. The trial court's conclusion is inconsistent with its findings of breach of fiduciary duty and materiality.

Although disgorgement is required, it may be of little consequence. In this case, Minnick's benefit was to be a commission of ten percent of the purchase price, or $22,500. What Minnick actually received was a $22,500 note from Blickensdorf. In this case equity requires only that Minnick disgorge and transfer to Nichols what he wrongfully obtained—the $22,500 note and any payments he has received toward that debt, together with interest on those payments. If Blickensdorf's note proves to be uncollectible, that merely reflects the fact that Minnick did not benefit from his breach, and restitution is not meaningful.

7

**Conclusion**

The trial court's order is reversed and the case is remanded with instructions to enter judgment ordering Minnick to assign to Nichols the note representing his commission and to disgorge to Nichols any payments received on that note, with interest on those payments at the statutory rate of eight percent per annum pursuant to Indiana Code section 24-4.6-1-101 (2004).

Shepard, C.J., and Dickson, Sullivan, and Rucker, JJ., concur.