CHITTENDEN COUNTY CLERK
FILED IN CLERKS OFFICE

DEC 1 9 2001

DIANE A LAVALLEE
CLERK

## STATE OF VERMONT
## CHITTENDEN COUNTY, SS.

RE/MAX PREFERRED )
)
    v. )
)
BRETT SCHREIBER )

Chittenden Superior Court
Docket No. S1109-01 CnSc

## NOTICE OF DECISION

This matter came before the Small Claims Court for a hearing on the merits on December 5, 2001. Plaintiff was represented by its duly authorized agent, Peter Rosenblum. Defendant Brett Schreiber represented himself.

### Findings of Fact

Peter Rosenblum is a real estate broker working for the plaintiff, a real estate agency. In August of 1999, Brett Schreiber telephoned Mr. Rosenblum from Pennsylvania concerning his desire to purchase a home for himself and his family in the greater Burlington area. They began to work together. Mr. Schreiber and his family came to Vermont in September 1999 to look at some properties, and in May of 2000, Mr. Schreiber came alone to look at more properties with Mr. Rosenblum.

On May 10, 2000, the two of them signed a Buyer's Agency Contract for a term from May 10, 2000 to November 11, 2000, whereby plaintiff was to serve as Mr. Schreiber's exclusive agent with respect to the purchase of property, and would receive a commission of 3% of the purchase price of any property defendant bought if it was listed and publicized (essentially located by defendant or otherwise publicly available), and 6% on non-publicized homes (essentially those that plaintiff located). Under this arrangement, both Mr. Rosenblum and Mr. Schreiber were free to continue looking for suitable properties, but once discovered, each had the obligation to notify the other, and they would thereafter work as a team, with Mr. Rosenblum serving as Mr. Schreiber's exclusive agent, and receiving, for his services, a commission at the time of purchase. They continued working together actively on finding a suitable property for the Schreibers.

1

Mr. Rosenblum was aware of a property in Hinesburg that he had previously sold to its then-current owner. He had been in touch with the owner for several years about the owner's possible desire to sell due to age and health problems. Mr. Rosenblum had talked to the gentleman approximately once a year about the possibility of listing his property for sale with the plaintiff agency. In May of 2000, Mr. Rosenblum telephoned the owner and said he was working with a buyer under a buyer's contract who might be interested in purchasing his home, and the owner could allow it to be looked at without having to list the property or committing to sell it. The owner told Mr. Rosenblum to "bring him by." Mr. Rosenblum took Mr. Schreiber to look at the property on or about May 18, 2000. Mr. Schreiber was interested in the property. Mr. Rosenblum telephoned the owner after the visit. The owner told him that he was not sure about selling as he did not have any place else to live and nothing to buy, and also that he would only sell his home if Mr. Rosenblum served as *his* agent on the sale rather than as the agent for the buyer.

Mr. Rosenblum then arranged for Mr. Schreiber to visit the property a second time. They met at the property the next day. Mr. Schreiber took photographs during the visit, and liked the property. At some point during this visit, they had a conversation: Mr. Rosenblum claims it took place before going inside the home for the second time, and Mr. Schreiber says that it was after they had completed their second view of the home, but both agree about the essential substance of the conversation. Mr. Rosenblum told Mr. Schreiber that the owner was not committed to sell, and would likely change his mind about selling unless Mr. Schreiber acted quickly, so that if he wanted this house, he had better follow through in a hurry.

Mr. Rosenblum further told Mr. Schreiber that the only way the house would be available for sale to the Schreibers was if Mr. Rosenblum changed from being Mr. Schreiber's buyer's broker to serving as the owner's broker, since the owner would not sell unless Mr. Rosenblum was his seller's agent. He further described how this could occur: Mr. Rosenblum and Mr. Schreiber would cancel their Buyer's Agency Contract, and Re/Max Preferred would then enter a listing agreement with the owner as the seller's agent. Mr. Schreiber would be a customer, and not a client. He could hire another buyer's broker if he chose, or he could act on his own behalf. Although Mr. Rosenblum did not say this, presumably if Mr. Schreiber hired another buyer's broker, there would be a 6% seller's commission built into the sales price, and Mr. Schreiber would probably also pay a 3% buyer's commission. Mr. Rosenblum did say that if Mr. Schreiber proceeded on his own, he should understand that Mr. Rosenblum would be protecting the owner's interest in the transaction.

Mr. Rosenblum further told Mr. Schreiber that if he were to proceed on his own, and wanted to structure a transaction without a financing contingency (Mr. Schreiber had lived for 10 years outside the country and was having problems establishing credit in the U.S.), it is most likely that the seller (upon Mr. Rosenblum's advice) would be requiring a $25,000.00 nonrefundable escrow deposit. He also described contingency terms that Mr. Schreiber might want to consider for himself if he chose not to work with another buyer's broker, including financing, appraisal, and inspection contingencies. He said to Mr. Schreiber, "you've been

2

through this before," presumably referring to the types of terms typically included in purchase and sales agreements, as Mr. Rosenblum had previously prepared a couple of them on behalf of Mr. Schreiber in connection with other properties in which Mr. Schreiber had been interested. He again told Mr. Schreiber that he had very limited time, as the owner was likely to change his mind about selling. After the visit and conversation, Mr. Schreiber returned to his home in Pennsylvania.

Thereafter, Mr. Schreiber was uncomfortable with the turn of events during the conversation. He then contacted three other brokers to discuss the situation (as Mr. Rosenblum had essentially encouraged him to do in describing the option of hiring another buyer's broker). He also contacted a lawyer. He reached the conclusion that Mr. Rosenblum had acted improperly by taking him to the owner's home for a second view of the property under circumstances when the only possibility of buying it was if Mr. Schreiber would consent to Mr. Rosenblum switching from being the buyer's agent to being the seller's agent in the same transaction. Mr. Rosenblum had clearly taken him for the first visit as Mr. Schreiber's buyer's agent.

In the meantime, Mr. Rosenblum called the Schreibers' home in Pennsylvania and talked to Mr. Schreiber's wife about the Hinesburg property. She was noncommittal. Mr. Schreiber was not at home. She took a message and said she would ask Mr. Schreiber to return the call.

During the course of his conversations with other brokers, Mr. Schreiber had made an arrangement with another broker to rent a property and had put a deposit down, with a plan of renting for a period before purchasing. On May 25, 2000, Attorney Edward Fitzpatrick wrote a letter on behalf of Mr. Schreiber to Mr. Rosenblum which reads as follows:

> I have been retained by Mr. and Mrs. Schreiber in their efforts to relocate to Vermont. As you know, they have not found suitable property. Indeed, it is their expectation that they will rent for perhaps a year to see what comes on the market.
>
> In any event, they no longer desire your services. Please consider this letter notice of termination of any relationship that you may have with them.
>
> Would you kindly send me a copy of any documents signed by my clients.
>
> Sincerely,
> Edward D. Fitzpatrick, Esq.

The contract, by its own terms, does not permit one party to terminate it unilaterally. Termination prior to the end of the contract term requires mutual consent.

Upon receiving this letter, Mr. Rosenblum waited for Mr. Schreiber to call, and when he did not call, Mr. Rosenblum called Mr. Schreiber on June 5, 2000. During the call, Mr. Schreiber stated that Mr. Rosenblum had acted unethically, and that he was disappointed with

3

Mr. Rosenblum for having abandoned his interests under the contract. Mr. Rosenblum stated that he had not abandoned the contract, and that it was still in force. He also stated that the Hinesburg owner was no longer interested in selling. Mr. Schreiber stated that he had signed a contract to purchase another property with a home built by Peter Fenn. Mr. Rosenblum asked why, and Mr. Schreiber stated that "our contract was canceled."

Subsequently, there were discussions between them about the fact that Mr. Rosenblum had done quite a bit of work on Mr. Schreiber's behalf, and they discussed the possibility of some sort of "restitution" for Mr. Rosenblum. The Schreibers then purchased the home built by Peter Fenn for $210,000.00. Mr. Rosenblum made an unannounced visit to the Schreibers' new home after they moved in, during which Mr. Rosenblum sought a commission, and the two men discussed settlement possibilities. Mr. Schreiber called Mr. Rosenblum back the next day and said he did not intend to pay anything, and not to come to the home again.

Plaintiff claims that a commission of 3% of $210,000.00 or $6,300.00 is due under the Buyer's Agency Contract, but is seeking only the maximum jurisdictional amount of $3,500.00 in this suit. Defendant claims that because of Mr. Rosenblum's improper conduct in conflict with his responsibility to Mr. Schreiber, Plaintiff had breached the contract, whereupon Mr. Schreiber had terminated it. He claims Plaintiff should not be entitled to collect any commission because of the breach and termination.

## Conclusions of Law

Based upon the foregoing findings of fact, the Court makes the following conclusions of law.

Plaintiff and defendant entered a Buyer's Agency Contract for the period from May 10, 2000 to November 11, 2000. The contract prohibited termination of the agreement unless both parties mutually agreed. On May 25, 2000, defendant attempted to terminate the agreement through a letter sent by his attorney to plaintiff. This attempt was ineffective to terminate the contract because the reason given was simply a desire to withdraw. Termination on such grounds required mutual consent.

Thereafter, during the term of the agreement, defendant purchased a home for $210,000.00. Aware of the home purchase and believing the contract was still in effect, plaintiff sought to collect his commission due under the contract for his previous work on behalf of the defendant and defendant's purchase of the home.

The issue in this case is not whether the buyer broker agreement was still in effect at the time of the purchase of the home. Assuming for the sake of argument the contract was in effect, the actual issue here is whether plaintiff is properly entitled to a commission under the contract. The Court concludes that because the plaintiff breached his duty to the defendant, the plaintiff is

4

not entitled to recovery of a commission.

In Vermont, a brokerage firm owes a fiduciary duty to any client with whom it has entered into a brokerage service agreement. Vermont Real Estate Commission Rule 4.3(a). The Vermont Real Estate Commission (Commission), which sets standards and licenses real estate brokers, has defined this duty as the duty

> to act for the benefit of the principal in matters relating to the agreement, to put the interests of the principal ahead of the interests of the agent or any third party, to disclose all material facts about the transaction or the opposite party to the agent's principal, to protect the principal's confidences, and to act with reasonable care and obedience.

Id. According to the Vermont Supreme Court, this duty requires that "[a] real estate broker, as an agent . . . act 'with the utmost good faith and loyalty for the furtherance and advancement of the interests of his [or her] principals.'" Quechee Lakes Rental Corp. v. Boggess, 158 Vt. 258, 263 (1992) (quoting Prouty v. Blanchard, 93 Vt. 206, 209 (1919)).

In this case, Mr. Rosenblum failed to act on behalf of Mr. Schreiber with the utmost good faith and loyalty. When Mr. Rosenblum had the conversation with the property owner about changing positions to become his seller's agent, he had a duty to inform Mr. Schreiber about this prior to taking Mr. Schreiber to the property for a second time. Although there is a dispute over when Mr. Rosenblum actually told Mr. Schreiber about switching to the seller's agent, Mr. Rosenblum certainly knew of the property owner's request *before* he offered to take Mr. Schreiber to the house for a second visit. Rather than giving Mr. Schreiber the benefit of knowing the situation before seeing the house again, Mr. Rosenblum waited until they were at the house for a second visit, misleading Mr. Schreiber into thinking that he had brought him there for the second time with Mr. Rosenblum acting with full loyalty to Mr. Schreiber. By doing so, Mr. Rosenblum, who knew that Mr. Schreiber was interested in the house, put Mr. Schreiber in the untenable position of being under pressure to make an immediate decision, not only about choosing to buy that property, but also whether to consent to permitting his agent to switch his loyalty to the opposite party. It is clear that Mr. Schreiber at least had a right to be aware of the material facts before making the decision to see the house again. See e.g. Boggess, 158 Vt. at 262 ("Part of this [fiduciary] duty requires that a broker disclose all matters that are material to, and might affect, the principal's actions.").

Mr. Rosenblum also failed his duty to Mr. Schreiber by giving the choice of either the property or his representation. According to Mr. Rosenblum, Mr. Schreiber could either allow Rosenblum out of the contract so he could represent the seller, or he could potentially risk losing the property. The choice essentially left Mr. Schreiber with no option if he wanted the property. Under Mr. Rosenblum's duty of loyalty to his principal, he should not have put Mr. Schreiber in that position. Mr. Schreiber faced the prospect of proceeding alone without the help of the agent

5

upon whom he had come to rely (who would have been working on behalf of his opposite) or with a brand new last-minute substitute. In addition, he faced the prospect of paying a substantial non-refundable deposit if he wanted to hold the Hinesburg property under contract. Once a contract is signed and a deposit paid, a seller's agent often receives a substantial portion of a non-refundable deposit if a buyer changes his mind and backs out. The facts strongly support an inference that Mr. Rosenblum's loyalty at that point was to his own self-interest. He had the prospect of receiving a seller's commission as well as an additional buyer's commission from a purchase the Hinesburg seller might subsequently make as a buyer. This would be a more remunerative total package than receiving a buyer's commission from Mr. Schreiber.

The issue here is whether Mr. Rosenblum adhered to his duty to exclusively protect Mr. Schreiber's interests. See e.g. id.("A person employing a broker to negotiate a sale 'bargains for the disinterested skill, diligence and zeal of the broker for his [or her] own exclusive benefit'"(quoting Yerkie v. Salisbury, 287 A.2d 498, 501 (Md. 1972))). By putting Mr. Schreiber in the position of having to accept an arrangement that provided clear benefit to both Mr. Rosenblum and the owner of the property at Mr. Schreiber's expense if he wanted to buy the property, it cannot be argued that Mr. Rosenblum was acting under the agreement for the sole benefit of Mr. Schreiber.

Given that Mr. Rosenblum breached his fiduciary duty to Mr. Schreiber, he cannot now claim that he is still owed a commission. In Vermont, "an agent who conceals material information from a principal, or does not otherwise comply with the principal's intentions, is not entitled to collect a commission on the sale." Boggess, 158 Vt. at 263. To explain the rule, the Restatement provides:

> An agent who, without the acquiescence of his principal, acts for his own benefit or for the benefit of another in antagonism to or in competition with the principal in a transaction is not entitled to compensation which otherwise would be due him because of the transaction. This is true even though the conduct of the agent does not harm the principal, and even though the agent believes that his conduct is for the benefit of the principal and that he is justified in so acting.

Restatement (Second) of Agency § 469 cmt. a (1958).

The denial of a broker's commission is appropriate even if no actual harm was caused by the breach. Boggess, 158 Vt. at 265. So long as some potential harm may have been caused to the principal as a result of the agent's breach, a court can properly deny the entitlement to the commission. Id. Here, Mr. Schreiber faced the potential of losing his broker and/or losing the opportunity to buy the property he was interested in. In addition, Mr. Schreiber faced the possibility of additional expense in having to hire another broker and pay brokers twice for the same transaction in which he had expected to pay only a single commission at the time he visited

6

the property for the second time. Because Mr. Schreiber was fortunate enough to find another house does not change the fact that he faced potential harm as the result of Mr. Rosenblum's breach. The potential harm was caused by Mr. Rosenblum's breach, and as a result, this Court denies Plaintiff's claim to a commission.

## ORDER

For the foregoing reasons, judgment is entered for the defendant and plaintiff shall take nothing on its claim.

So Ordered.

Dated at Burlington this 19th day of December, 2001.

Mary Miles Teachout
Superior Court Judge

7